UNITED STATES, Appellee

v.

John D. GUNKLE, Staff Sergeant
U.S. Army, Appellant

No. 00-0092

Crim. App. No. 9701960

United States Court of Appeals for the Armed Forces

Argued November 8, 2000

Decided May 21, 2001

GIERKE, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., and EFFRON and BAKER, JJ., joined. SULLIVAN, J.,
filed an opinion concurring in part and in the result.

<u>Counsel</u>

For Appellant: Captain Katherine A. Lehmann (argued); Colonel
Adele H. Odegard, Major Jonathan F. Potter, and Captain David
S. Hurt (on brief); Lieutenant Colonel David A. Mayfield and
Major Scott R. Morris.

For Appellee: Captain Steven D. Bryant (argued); Major Bryan T.
Broyles and Captain Mary E. Braisted (on brief); Colonel
David L. Hayden, Colonel Russell L. Estey, Lieutenant Colonel
Edith M. Rob, and Captain Katherine M. Kane.

Military Judge: Kenneth D. Pangburn

<u>**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE PUBLICATION**</u>.

Judge GIERKE delivered the opinion of the Court.

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of two specifications each of indecent liberties and indecent acts, and one specification of cross-dressing in a woman's clothing under circumstances that were service-discrediting and prejudicial to good order and discipline, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. The adjudged and approved sentence provides for a dishonorable discharge, confinement for 2 years, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion. This Court granted review of the following issues:

I

WHETHER THE ARMY COURT ERRED IN FINDING THAT THE MILITARY JUDGE'S ABUSE OF DISCRETION WAS HARMLESS WHEN HE ADMITTED IN REBUTTAL EXCERPTS FROM AN OUT-OF-COURT INTERVIEW OF [DG], ONE OF THE ALLEGED CHILD VICTIMS, AND ALLOWED A SOCIAL WORKER TO TESTIFY AS TO STATEMENTS MADE BY [LA], THE OTHER ALLEGED CHILD VICTIM, DURING AN OUT-OF-COURT INTERVIEW, EVEN THOUGH THE ALLEGED VICTIMS TESTIFIED.

II

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION IN DENYING THE DEFENSE AN EXPERT THAT THE MILITARY JUDGE DETERMINED WAS NECESSARY TO EVALUATE THE TECHNIQUES USED BY THE SOCIAL WORKERS WHEN THEY INTERVIEWED THE ALLEGED VICTIMS, DESPITE THE FACT THAT THE MILITARY JUDGE ALLOWED INTO EVIDENCE EXCERPTS OF [DG'S] INTERVIEW AND ALLOWED ONE SOCIAL WORKER TO TESTIFY AS TO STATEMENTS MADE BY [LA] DURING AN OUT-OF-COURT INTERVIEW.

III

WHETHER THE STAFF JUDGE ADVOCATE'S RECOMMENDATION, WHICH INCORRECTLY REFLECTED THAT APPELLANT HAD BEEN FOUND GUILTY OF CERTAIN TYPES OF EGREGIOUS CHILD MOLESTATION, PREJUDICED APPELLANT WHEN THE CONVENING AUTHORITY CONSIDERED CLEMENCY.

For the reasons set out below, we affirm.

## ISSUE I: HARMLESS ERROR

### A.  Factual Background

The prosecution theory was that appellant surreptitiously molested the two 5-year-old victims for sexual gratification. The Court of Criminal Appeals summarized the prosecution evidence as follows:

> On three occasions over the course of several months, the appellant appeared in the presence of his five-year-old daughter, DG, and her five-year-old friend, LA, while dressed in female attire consisting of thigh-high stockings, a bra, panties, and a slip. He exposed his penis to both girls, and allowed his daughter to fondle it.
>
> At trial, both girls described the above encounters.  LA testified that DG played with the appellant's penis by holding it and moving it.  She stated that the appellant's penis was "big," and that "pee" came out of it on one occasion, although she gave contradictory accounts of whether the appellant's penis was pointing upwards or down to the floor.  DG then explained that she played games with the appellant's penis by taking turns with LA pulling down the appellant's underwear, and that she held the appellant's penis on three occasions, while LA touched it on one occasion.  Both girls denied that the appellant ever pushed their hands away or otherwise told them to stop.

Unpub. op. at 2 (footnote omitted).

The prosecution introduced appellant's written statement, which he gave to agents of the U.S. Army Criminal Investigation Command (CID).  In this statement, appellant admitted that he had been cross-dressing for sexual gratification since he was about 13 years old.  He stated that in September or October of 1996, DG and LA discovered him dressed in female clothing.  The girls giggled, and appellant told them he was trying on a costume.  He stated that in November 1996, DG and LA again discovered him in

female clothing.  On this occasion, DG pulled up his slip, grabbed his penis, and said, "I see your wee wee."  He said that he brushed DG's hand away, the girls giggled, and he walked to his bedroom to change clothes.

Appellant told the CID that on March 12, 1997, DG and LA again surprised him when he walked from his bedroom to the kitchen in female clothing.  He said that DG pulled up his slip, and he felt someone tugging on his penis and pulling down his panties.  He admitted having an erection during this third episode.  Finally, appellant told the CID that DG grabbed his penis on two other occasions, once while he was urinating and once as he was coming out of the shower.  He told the CID that during the three encounters with DG and LA, he was not looking for sexual gratification.

The theory of the defense was that appellant cross-dressed in female clothing for sexual stimulation, that his encounters with DG and LA were inadvertent, that DG's touching was uninvited and innocent, and that appellant did not seek sexual gratification from his encounters with DG and LA.  The Court of Criminal Appeals summarized appellant's in-court testimony as follows:

> The appellant testified in his defense consistent with his previously admitted confession, describing in more detail the three separate encounters which he characterized as unplanned and inadvertent.  He denied that the girls touched him at all during the first episode, which occurred in DG's bedroom; claimed that DG merely poked at his covered genitals during the second, which occurred in the hallway near the bathroom; and admitted only that DG had pulled up his slip and tugged at his underwear during the third, again in the hallway.  He stated that he slapped or pushed DG's hand away both times she tried to touch him.  He agreed that his penis was "semi-erect" during

> one encounter, but averred that his arousal stemmed solely from the titillation of cross-dressing, not from the contact with the young girls.

Id. at 2.  Appellant concluded his in-court testimony by unequivocally denying that he solicited or allowed the girls to touch him and denying that the touching sexually aroused him.

Over defense objection, the military judge permitted the prosecution to present rebuttal testimony from the two social services forensic interviewers who conducted videotaped interviews of DG and LA.  The videotapes themselves were not offered in evidence.  Ms. Regina Downum remembered interviewing DG but could not remember what she said.  She identified an extract from the transcript of the interview, and she testified that it "appear[ed] to be" an accurate reflection of the interview.  The transcript was admitted in evidence as past recollection recorded.  The transcript reflects that DG told Ms. Downum that she, LA, and appellant played a game where appellant would lie down, DG would pull up appellant's skirt, LA would pull down his underwear, and then DG would feel his "wee-wee."  DG stated that "it felt like it had pee in it."

Ms. Peg Sneller-Hamilton testified that she interviewed LA.  Trial counsel asked what LA said, and Ms. Sneller-Hamilton testified as follows:

> That [LA] said that she and [DG] would play with [DG's] dad -- as I think she called it a "wee-wee," and that they pulled down his pants -- and she demonstrated, I think the words were like "swishing it back and forth and pulling on it," and she demonstrated doing that.  I think they touched it when it was in the underwear too, and also when it was out of the underwear.  But she also said that the pants were pulled down.  That's what I remember about that.

5

Trial counsel then asked how far LA said they pulled the underwear down, and Ms. Sneller-Hamilton responded as follows:

> I want to say she showed on the tape by pointing at her own leg. I'm going to say mid thigh, but that's -- I think on the tape I said, "Show me where they were pulled down," and I think she showed on her own leg where they were pulled.

The Court of Criminal Appeals held that the military judge erred by admitting the testimony of the two forensic interviewers and the interview transcript, and neither side has challenged that holding. The parties disagree on the question whether the military judge's error was harmless.

## B.  Discussion

Appellant now argues that the military judge's error was prejudicial because it allowed the prosecution to use hearsay to establish the "previously unproven contention that appellant was aroused by [DG's] touch." Final Brief at 10. The Government argues that the error was a nonconstitutional evidentiary error and that it was harmless. Answer to Final Brief at 11.

We review de novo the lower court's determination that the error was harmless. United States v. Diaz, 45 MJ 494, 496 (1997). The test for nonconstitutional evidentiary error is whether the error had a substantial influence on the findings. Kotteakos v. United States, 328 U.S. 750, 765 (1946); United States v. Pollard, 38 MJ 41, 52 (CMA 1993). In this case, the parties agree that the error was nonconstitutional and that the Kotteakos test is applicable.

We evaluate prejudice from an erroneous evidentiary ruling by applying the four-part test enunciated in United States v. Weeks, 20 MJ 22, 25 (CMA 1985). We weigh (1) the strength of the

6

prosecution case; (2) the strength of the defense case; (3) the materiality of the evidence at issue; and (4) the quality of the evidence at issue. See United States v. Kerr, 51 MJ 401, 405 (1999).

We hold that the error was harmless. Turning first to the comparative strengths of the prosecution and defense cases, we note that the prosecution relied on the sworn testimony of DG and LA, which was specific and unequivocal, and the defense relied on appellant's testimony, which was also specific and unequivocal. However, the believability of appellant's assertion that all the encounters with DG and LA were inadvertent and unwanted was seriously diminished by the repetitive nature of the encounters.

The evidence was material to the issue whether appellant attempted to dissuade the girls from touching him or permitted them to uncover his genitals and touch them, but it was cumulative in that it recited substantially the same facts as the in-court testimony of DG and LA. The disputed rebuttal testimony added virtually nothing to the factual dispute whether appellant's female clothing or DG's touching aroused him. The case was tried before a military judge, who had ample opportunity to assess the credibility of DG and LA, as well as appellant. The military judge had already reviewed the interview transcripts in connection with the defense request for expert assistance, and had determined that portions of LA's interview were of questionable reliability. Based on the entire record, we are satisfied that the error did not have a substantial influence on the military judge's findings.

## ISSUE II: EXPERT ASSISTANCE

### A. Factual Background

Before entry of pleas, the defense requested that the Government provide funds for an expert, Dr. Gordon, to be a defense consultant and to assist the defense in trial preparation by reviewing the videotapes of the interviews to determine if suggestive or coercive interviewing techniques made them unreliable. The defense also wanted Dr. Gordon to testify and challenge the trustworthiness of the interviews of the two girls if the prosecution succeeded in having the videotaped interviews admitted in evidence.

The military judge did not view the videotapes or admit them in evidence. Instead, he read the written transcripts of the interviews. He concluded that the interviews, "overall, were not unduly suggestive or coercive." He concluded that, based on the transcript, the interview of DG "was proper and not subject to any coaching or suggestion by the interviewer," and that "[a]ll the substantive responses were given to non-leading type questions." He also found that "the responses in the first third of the interview [of LA] were entirely proper," and that "she also seemed to volunteer detailed statements adverse to the accused."

In the remainder of the interview, he found that "leading questions which may have been suggestive were used by Mrs. Peg Sneller-Hamilton." He concluded that the suggestive questions produced responses that "would give [him] some doubt as to their reliability." He opined that "expert assistance might be helpful to interpret whether the interviewed [sic] was even focused or

8

paying attention to the questions," but he concluded that the issue could be resolved without an expert, either by deleting those questions and answers from the transcript, bringing out the suggestive nature of the questions on cross-examination of the interviewer, or by a "proper instruction crafted to advise the trier-of-fact as to what can be considered or the dangers in some questions."

With respect to the possibility that a parent, interviewer, criminal investigator, or social worker "engaged in intentional or unintentional acts of coercion or subduction while interviewing any child witness in the case," the military judge opined that he did not "really see how an expert can tell you what took place prior to the interview" without becoming a "human lie detector." Accordingly, he ruled that the defense had not shown why Dr. Gordon's assistance was necessary for trial preparation.

In a conference under RCM 802, Manual for Courts-Martial, United States (1995 ed.),[1] before the hearing on the request for expert assistance, defense counsel indicated that appellant might pay for Dr. Gordon's examination of the interview transcripts. After denying the defense request, the military judge informed the defense that if they hired Dr. Gordon, and if she reviewed the transcripts and discovered information favorable to the defense, he would "consider that question when it comes up."

---

[1] This provision is unchanged in the current Manual.

Thereafter, appellant hired Dr. Gordon at his own expense. At a subsequent hearing, defense counsel renewed his request that Dr. Gordon be produced to testify for the defense. Appellant did not renew his request for funding or request reimbursement for the personal funds he had expended. Defense counsel informed the military judge that appellant had hired Dr. Gordon, that she had reviewed the videotaped interviews, and that she was "suspicious of the reliability of certain portions" of LA's videotaped interview and "a great deal of" DG's interview.

The military judge opined that Dr. Gordon "would only be needed in the event that the young ladies are unable to testify and the video tape has to come into evidence or is offered into evidence." The military judge deferred a ruling on the request, tentatively agreeing with defense counsel that Dr. Gordon might be a necessary witness. The military judge concluded the hearing on this issue by telling the defense:

> If the video is to come in, in my view either the witness should be produced or some agreement should be made concerning what her testimony would be. It should be either stipulated to or an affidavit should be received. That's my opinion at this point, however, that's all prospective.

He then denied the motion to produce Dr. Gordon on the ground that it was "a bit premature."

After the military judge overruled a defense objection to rebuttal testimony by the two forensic interviewers, defense counsel asked if he would be permitted to consult with Dr. Gordon after the rebuttal testimony. The military judge responded, "Well, I think you could do it for surrebuttal at least." After the two forensic interviewers testified, defense counsel obtained

a 10-minute recess, consulted by telephone with Dr. Gordon, and announced that the defense had no further evidence to present.

## B. Discussion

An accused is entitled to expert assistance provided by the Government if he can demonstrate necessity. United States v. Garries, 22 MJ 288, 291 (CMA 1986). To demonstrate necessity, an accused "must demonstrate something more than a mere possibility of assistance from a requested expert . . . ." An accused "must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." United States v. Robinson, 39 MJ 88, 89 (CMA 1994), quoting Moore v. Kemp, 809 F.2d 702, 712 (11th Cir.), cert. denied, 481 U.S. 1054 (1987). This Court has adopted the three-pronged test for determining necessity: (1) Why is the expert needed? (2) What would the expert accomplish for the defense? and (3) Why is the defense counsel unable to gather and present the evidence that the expert assistant would be able to develop? United States v. Ford, 51 MJ 445, 455 (1999), quoting United States v. Gonzalez, 39 MJ 459, 461 (1994); see also United States v. Ndanyi, 45 MJ 315, 319 (1996). We review a military judge's ruling on a request for expert assistance for abuse of discretion. Ford, supra.

In this case, we need not decide whether the military judge abused his discretion when he denied the defense request for pretrial expert assistance, because any error was rendered moot by subsequent actions in the case. Appellant requested funds for Dr. Gordon to review the videotapes and interview transcripts to

determine whether the young victims' accounts were influenced by suggestive interview techniques or their own cognitive limitations.  The written motion and litigation focused on preparing and qualifying Dr. Gordon to testify, should the prosecution introduce the tapes at trial.  After the military judge denied the defense request, appellant hired Dr. Gordon at his own expense to review the tapes and transcripts.  Dr. Gordon conducted the requested review, which provided the basis for appellant's motion to produce Dr. Gordon as a witness.  Because appellant received the expert assistance he sought, albeit at his own expense, this issue is moot.[2]

With respect to the defense request that Dr. Gordon be produced at government expense to testify for the defense, the military judge left the door open by informing the defense that he would reconsider his ruling if Dr. Gordon reviewed the transcripts and could offer information favorable to the defense. Despite multiple invitations to proffer evidence from Dr. Gordon, defense counsel did not renew his request that Dr. Gordon be produced to testify.  Instead, defense counsel telephonically consulted with Dr. Gordon and then informed the military judge that the defense had no further evidence to present.  We hold that the defense's failure to renew its request waived the issue. See United States v. Browning, 54 MJ 1, 9 (2000); United States v. Rockwood, 52 MJ 98, 105 (1999); United States v. Holt, 52 MJ

---

[2] Even if the military judge erred, the only remedy available to appellant would be reimbursement for expenses that should have been paid by the Government, and appellant has not raised the issue of reimbursement in this appeal.

173, 186 (1999); United States v. Cardreon, 52 MJ 213, 216 (1999).

## ISSUE III:  ERRONEOUS POSTTRIAL RECOMMENDATION

### A.  Factual Background

In his posttrial recommendation, the Staff Judge Advocate (SJA) correctly reflected the findings of the military judge by exceptions and substitutions.  The SJA did not inform the convening authority that the military judge had granted a defense motion for a finding of not guilty with respect allegations that

(1) appellant had penetrated LA's vagina with a hand-held mirror;

(2) appellant had caused LA to fondle his buttocks and rectum, and caused her to sit on his face while clothed; and

(3) appellant had caused DG to fondle his buttocks and rectum and to sit on his abdomen.

The military judge also sustained the defense motion for a finding of not guilty with respect to "causing" DG and LA to perform the acts charged, and substituted "allowing" for "causing" the acts to occur.  The effect of the military judge's ruling was to acquit appellant of the three acts set out above and to change the character of the remaining indecent acts from actively "causing" the girls to participate to passively "allowing" the girls to touch him.  The SJA did not mention any of the above rulings.

Appellant submitted a clemency petition but did not assert that the SJA's recommendation was erroneous, confusing, or defective as written.  In the clemency petition, defense counsel pointed out the above-described favorable rulings of the military judge.  The record contains a memorandum, personally signed by

the convening authority on the date of his action, specifically stating that he considered defense counsel's submission. The SJA did not submit an addendum to his recommendation or in any way dispute defense counsel's description of the military judge's rulings.

### B. Discussion

RCM 1106(d)(3)(A) requires the SJA to provide the convening authority with "concise information as to . . . [t]he findings and sentence adjudged by the court-martial." We agree with the Court of Criminal Appeals that RCM 1106(d)(3)(A) required only that the SJA state "the nature of the crimes, indecent liberties or indecent acts, without specifying exactly what acts the appellant was found guilty of or what language was excepted or substituted." Unpub op. at 10. The SJA's recommendation described the nature of appellant's crimes with sufficient accuracy "to assist the convening authority to decide what action to take on the sentence in the exercise of command prerogative." RCM 1106(d)(1). The burden was on appellant to provide any additional information deemed favorable to the defense. Appellant provided such additional information in his clemency submission, and the convening authority specifically considered appellant's submission before approving the adjudged sentence. On these facts, we hold that there was no error at all, much less plain error. See RCM 1106(f)(6).

### DECISION

The decision of the United States Army Court of Criminal Appeals is affirmed.

14

SULLIVAN, Judge (concurring in part and in the result):

I agree with the majority's resolution of Issue I and part of its resolution of Issue III. I agree with the result reached on Issue II. However, I have come to this conclusion for a different reason.

Regarding the defense request for expert assistance (Issue II), the military judge did not err because the defense could not adequately explain why the expert was "necessary" under the test laid out by this Court in United States v. Gonzalez, 39 MJ 459, 461 (CMA 1994). The first prong of this test asks "[w]hy the expert assistance is needed?" and the second prong asks "[w]hat would the expert assistance accomplish for the accused?" Id. In arguing necessity, appellant did not explain why a knowledgeable and prepared defense counsel could not achieve the same results (i.e., suggesting that the victims had been influenced, coached, etc.) on cross-examination as putting an expert witness on the stand to testify directly. Certainly, expert testimony would have been "helpful," as appellant pointed out. However, helpfulness alone is not enough to demonstrate necessity.

With respect to the Staff Judge Advocate's recommendation (Issue III), appellant has failed to establish error, never mind plain error. Appellant argued on appeal that the Staff Judge

Advocate's recommendation did not reflect the portion of the specifications that the military judge dismissed when he granted the defense motions for findings of not guilty. See RCM 917, Manual for Courts-Martial, United States (1995 ed.). The Rules for Courts-Martial, however, state that the "findings and sentence adjudged by the court-martial" must be included in the recommendation. RCM 1106(d)(3)(A) (emphasis added). In my view, both the Staff Judge Advocate's recommendation and the General Court-Martial Order accurately reflect the findings and sentence adjudged by the court-marital as required by this rule. In any event, as explained by the majority, appellant suffered no prejudice in this case. Accordingly, I affirm.