CRAWFORD, Chief Judge
(dissenting):
Contrary to the majority’s view that “[t]he necessity for expert assistance is not at issue in this case,” 55 MJ at 275,1 believe the sole issue is whether appellant demonstrated that Dr. Blake’s expert assistance was necessary. A concession that an appellant is entitled to interpretive assistance from one expert does not, ipso facto, turn a necessity-for-a-second expert question into an adequacy-of-expert-assistance inquiry. That appears to be what the majority has done. Accordingly, I respectfully dissent.
Upon a showing of necessity, any accused is entitled to competent assistance of an expert. See Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); United States v. Gunkle, 55 MJ 26, 31 (2001); United States v. Short, 50 MJ 370, 372 (1999), cert. denied, 528 U.S. 1105, 120 S.Ct. 843, 145 L.Ed.2d 712 (2000); United States v. Ndanyi, 45 MJ 315, 319 (1996); United States v. Burnette, 29 MJ 473, 475 (CMA), cert. denied, 498 U.S. 821, 111 S.Ct. 70, 112 L.Ed.2d 43 (1990); United States v. Garries, 22 MJ 288 (CMA), cert. denied, 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986). This Court *278 has adopted a three-pronged test for showing that expert assistance is necessary. United States v. Gonzalez, 39 MJ 459, 461, cert. denied, 513 U.S. 965, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994). See United States v. Ford, 51 MJ 445, 455 (1999). It is the defense’s burden to show (1) why the expert is needed; (2) what such expert assistance would accomplish for the defendant; and (3) why defense counsel is “unable to gather and present the evidence that the expert assistant would be able to develop.” Once defense counsel has met this Gonzalez test and shown necessity, the Government must provide “competent” expert assistance. See Ndanyi, 45 MJ at 319. Additionally, “[d]efense counsel are expected to educate themselves to obtain competence in defending an issue presented in a particular case.” United States v. Kelly, 39 MJ 235, 238 (CMA), cert. denied, 513 U.S. 931, 115 S.Ct. 324, 130 L.Ed.2d 284 (1994).
By specifically approving the defense request to hire Dr. Conneally, the Government conceded that appellant was entitled to expert assistance in interpreting the DNA findings of LabCorp, and nothing more. See RCM 703(d), Manual for Courts-Martial, United States (1995 ed.). The Rules for Court-Martial are not written to provide trial defense counsel with “a credit card” once necessity for one expert witness is established. If Dr. Conneally was unable to provide the advice for which money was appropriated, then it was incumbent on defense counsel to demonstrate, anew, necessity, using the Gonzalez test, for Dr. Blake. To say that because money had been set aside for one expert (Dr. Conneally) for a particular purpose, that money belonged to defense counsel and could automatically go to a different expert (Dr. Blake) for different assistance is contrary to RCM 703(d).
Tfie sole hypothesis under which trial defense counsel argued the necessity of Dr. Blake’s expert assistance was that the victim’s fingernails (and skin under the fingernails from which DNA analysis was made) were somehow “contaminated.” Dr. Blake was not shown to be a relevant and necessary expert witness on the subject of contamination. Accordingly, the military judge properly denied the defense’s request to substitute Dr. Blake for the previously funded Dr. Conneally.
FACTS
Detailed defense counsel requested the general court-martial convening authority to approve employment of Dr. Patrick M. Con-neally, Ph.D., an expert consultant in the field of DNA analysis, on March 20,1996. In support of his request, detailed defense counsel stated:
Defense believes that it is necessary that an expert consultant review the Government’s DNA analysis, review the Government’s findings and procedures, independently analyze the data, and familiarize defense counsel with DNA uses generally.
Later in the same request defense counsel wrote: “Should Government grant Defense’s request for Dr. Conneally’s services, there is the probability that Dr. Conneally will testify as a Defense expert witness in the case of U.S. v. McAllister." Defense counsel had been in possession of LabCorp’s (see 55 MJ at 279, infra) findings and report for 2 months prior to this request to employ Dr. Conneally. Presuming defense counsel to be both competent and ethical, we must presume that defense counsel and Dr. Conneally talked about LabCorp’s report and PCR testing procedures prior to defense counsel’s March 20 request to employ Dr. Conneally as an expert. On April 4, 1996, the convening authority approved Dr. Conneally’s employment, as well as that of another expert, Dr. Hardman, a forensic pathologist.
Pursuant to a government motion to admit DNA evidence, the military judge held a hearing on April 23, 1996. Prior to taking testimony, the military judge asked defense counsel whether they were “satisfied” with their DNA expert (Dr. Conneally). Civilian defense counsel responded:
He was approved at least for — to act as a consultant. There was not approval for him for funding for trial testimony. We did send him the materials. We did have a consultation. He recommended, frankly, *279 that we retain someone who is an expert in PCR testing, specifically.
After determining that defense counsel was shopping for an expert and “attempting to contact Dr. Conneally to get his suggestions on someone, hopefully out of California,” the military judge cautioned counsel that they needed to submit the request for any additional expert witnesses first to the convening authority and that it was “not up to the Government to find” their expert witnesses for them.
Trial counsel later on presented witnesses who were present at PFC Shanklin’s autopsy. In particular, evidence was adduced that explained how Dr. Ingwersen cut the deceased’s fingernails and how these fingernails were collected and preserved. Defense counsel’s cross-examination clearly focused on the possibility of contamination during the autopsy process.[1] In particular, counsel explored whether the deceased’s hands had been covered prior to the autopsy. Questioning revealed that PFC Shanklin’s hands and feet had been wrapped in paper bags prior to the autopsy. Defense counsel also asked whether any of the participants in the autopsy coughed or sneezed during the procedure.
Mr. Overson, from the CID lab in Atlanta, explained his receipt of the items to be tested from the CID office in Hawaii and the transfer of these items to LabCorp for testing. Again, the theme of potential contamination played a prominent part in the examination and cross-examination of Mr. Overson. Counsel established that Mr. Overson saw dirt or a substance that appeared to be dirt under the deceased’s fingernails, and that the deceased used fingernail polish. Cross-examination also established that Mr. Overson “did not see any apparent blood, apparent skin,” or “any apparent other substance extraneous to the fingernail scrappings which I would call a definite biological substance.”
Following Mr. Overson, Ms. Meghan Clement, Assistant Director of Forensic Identity Testing at Laboratory Corporation of America Holdings Incorporated, was qualified as an expert witness. Ms. Clement testified that the “scientific community has been conducting DNA testing probably since the late 70s, early 80s.” She noted that “the scientific community has reached the conclusion that as long as a test is performed properly and proper controls are employed that DNA testing in a forensic arena is reliable and acceptable.” Ms. Clement explained that the forensic scientific community recognized three types of DNA testing, one of which, polymerase chain reaction (PCR), was used in appellant’s case.[2] She observed that there were “numerous major laboratories, including the Federal Bureau of Investigation,” that were “doing some type of PCR analysis or initiating it in validation studies.” She remarked that LabCorp was certified by the College of American Pathologists (CAP) and that the laboratory participated in proficiency testing programs sponsored by CAP as well as Selmark Diagnostics from London, England.
At trial, Ms. Clement testified that Lab-Corp tests ten areas (or particular genetic systems) for DNA. In the case at bar, Lab-Corp examined eight particular DNA target areas — DQ Alpha, LDLR, GYPA, HBGG, D7S8, GC, D1S80, HUMTHOl. When these specimens were initially submitted for examination, LabCorp was testing only eight different areas for DNA. The two other areas, which LabCorp had added by the time of trial, were not validated when the samples *280 related to appellant’s case were undergoing analysis.
The best answer to the majority’s supposition that additional testing may create a different result can be found in the record of trial. During recross-examination of Ms. Clement, defense counsel asked “how can it be said with any assurance that matches would not be found if the tests were carried out to their fullest extent?” Ms. Clement answered:
With DNA analysis if there is a difference at a single genetic system, in other words, if there is a characteristic which is not found in evidentiary materials, then that person is excluded immediately. Whether you test 1 system or whether you test 10 systems they will be excluded the minute you find one characteristic which is different.
The remainder of defense counsel’s cross-examination focused on showing that the DNA may have been contaminated through sneezing or improper handling of the fingernails. Ms. Clement explained that “[wjithin our laboratory there have been a couple instances of contamination which has been detected. Generally, the most common form of contamination is by the analyst [sic] themselves. And we have complete profiles on every technologist who works there.” If additional DNA testing, as the majority wishes, found contamination by a technologist at LabCorp, it would provide no benefit to appellant unless appellant can somehow make a laboratory analyst in the Research Triangle of North Carolina a suspect in a murder that took place in Hawaii.
At the time she announced her findings on the Government’s motion to admit LabCorp’s DNA testing results, the military judge informed counsel that any defense request for further DNA testing would need to be submitted to the United States not later than close of business on April 29.[3] On April 29, government counsel received a FAX from the accused’s civilian defense counsel requesting the retesting of “alleged DNA fingernail material” by Forensic Science Associates in Richmond, California.
At an Article 39(a) session on May 15, 1996, civilian defense counsel asked the military judge to allow substitution of Dr. Edward Blake for Dr. Conneally as the defense DNA expert. Counsel informed the military judge that Dr. Blake ran Forensic Science Associates, a DNA testing laboratory in California, and that he would retest the fingernail evidence. Defense counsel stated that Dr. Blake had labeled LabCorp as a “paternity testing lab” without “specific experience in criminal forensic testing.” In response to the military judge’s question to civilian defense counsel as to whether Dr. Blake’s California lab was certified, the following took place:
CDC: I believe so—
MJ: Because it’s not listed in the—
CDC: —I would have to—
MJ: It is not listed in the offer nor is it listed in the qualifications for Doctor Barker [sic] nor — Mr. Barker [sic] nor or [sic] any qualification listed down for him.
CDC: He is the person who invented one of the DNA tests—
TC: I don’t believe he invented DQ Alpha, ma’am. The person who invented DQ Alpha got the Nobel Prize.
MJ: Yeah, that’s my recollection too, although it’s certainly not in evidence. Because in the, I guess what passes to be a curriculum vitae for Doctor Barker [sic], he lists only two areas that that lab tests in whereas LabCorp tested, according to the exhibits submitted along with the government’s response, that the testing was actually done like in eight different areas. So, how on earth can this lab retest what it doesn’t have the capacity to retest? And there’s no showing of any kind of controls *281 that the requested lab employees, there’s no showing of any testing, I guess that’s done by peer review organizations on any sort of regular basis. In other words, I guess what I’m asking for is even if this retesting were done, how would this — how would you set a foundation for this under United, States versus Youngberg or Mer-rell Dow case? Because that was the whole point of Megham Clement coming and testifying was to lay the foundation which is required to be laid for scientific testimony. That’s not in the offer here, because I think what I’m reading is the basis of your motion is you think the convening authority applied an incorrect standard in reviewing the request for independent testing. So, I guess my question is what do you think the standard is for testing DNA evidence? Because what I read is that there are some broad statements that you have to, you know, clip the nails in half and I don’t recall Meghan Clement ever testifying about whether nails were clipped or not clipped. What I recall her saying is that the materials are still available for retesting. Does the government — do you know?
(Emphasis added.) At that point defense counsel adopted the “possibility of contamination” theory as a reason for needing Dr. Blake’s expertise. After applying the law announced by this Court in United States v. Gonzalez, United States v. Kelly, and United States v. Garries, all supra; and United States v. Mosley, 42 MJ 300 (1995), the military judge found that defense counsel had not met his burden of showing what Dr. Blake’s laboratory would contribute to the defense case other than providing a mere possibility of something being discovered.
Having failed to show the necessity for Dr. Blake’s expert assistance, counsel then argued his alternative theory to contamination: a failure in the chain of custody that caused defendant’s blood sample to be mislabeled as a reason for needing Dr. Blake’s assistance. Finally, defense counsel argued “fundamental fairness.” In reply the military judge stated:
MJ: I see your point but there still has to be some kind of showing of likelihood of error for it to arise to an issue of fundamental fairness. Remember Mosley was a $250.00 EME test that had never been performed.
MJ: So, that is a different situation. That would be like you coming in and saying, “Doctor Blake only performed DNA for the government on two DNA areas, yet there is a lab called LabCorp that could test in eight different areas which would reduce the likelihood of an incorrect result.” Then I might look at it differently if there are tests that would be available that could do more. But that’s not what you’re asking for here. And this is not a Mosley type issue when you’re talking about $250.00 EME test. This does not arise to an issue of fundamental fairness in this case.
Lastly, civilian defense counsel said: “The defense position really is that we would like to substitute Dr. Blake for Dr. Conneally — ” The military judge correctly noted that this substitution-of-experts issue was not before the court because the “convening authority, in good faith, relied upon the defense representation, looked at Dr. Conneally’s qualifications ... [and] gave the defense what they wanted.” This Court has never held that once a convening authority funds a necessary defense expert that those funds then come under the dominion and control of either defense counsel or the funded expert witness for use to hire different experts as they see fit.
DISCUSSION
RCM 703(d) clearly states that it is the convening authority who “authorize^] the employment” and “fix[es] the compensation for the expert,” not the defense counsel. The only remedy for refusal to provide judicially determined expert help is abatement of the proceedings.
Accordingly, one must then look at the military judge’s findings to see whether she abused her discretion by refusing to order *282 substitution of Dr. Blake and his Richmond, California, laboratory for Dr. Conneally.
When one sorts through the fog surrounding defense counsel’s three written requests for substitution of DNA expert assistance, argument of counsel, and responses to questions in the record of trial, it is obvious that defense counsel wanted a retest of the victim’s fingernails based on his theories that the chain of custody which got appellant’s blood sample to LabCorp in North Carolina was faulty and that there was a possibility of contamination. Defense counsel failed to specifically allege or show that Dr. Conneally was incompetent to render the assistance for which he was hired.
There is absolutely no allegation that Lab-Corp’s findings were somehow improper unless they had received contaminated fingernails or tainted blood. Counsel was unable to identify any irregularity in the testing of the deceased’s fingernails or even make an offer' of proof that would warrant hiring Dr. Blake and his laboratory. For example, counsel never argued how additional testing might point to another theory of the crime or cause of death. Cf. Barnabei v. Angelone, 214 F.3d 463, 474 (4th Cir.) cert. denied, 530 U.S. 1300, 121 S.Ct. 24, 147 L.Ed.2d 1047 (2000). Accordingly, defense counsel did not demonstrate necessity for this second DNA expert.
The chain-of-custody issue and the potential mix-up of vials of blood, to include appellant’s, was thoroughly litigated at trial. Defense counsel’s piercing cross-examination failed to undermine the reliability of the handling and custody of either the victim’s or appellant’s vials of blood drawn in Hawaii.
The issue of potential contamination was more than thoroughly explored by defense counsel during his cross-examination of those witnesses who conducted the autopsy, as well as his cross-examination of Ms. Clement. The defense theory was that the deceased’s fingernails had become contaminated in some manner by those conducting the autopsy (such as sneezing on them) and as a result of that contamination, the DNA test was unreliable. Testimony revealed, however, that the victim’s hands were wrapped before the autopsy and palms were facing down after being exposed. Therefore, there was much less opportunity for any contaminates (and none were ever shown to exist) to get under the nails. Further questioning showed the victim’s fingernails were short anyway.
Expert witnesses are not necessary for a knowledgeable defense counsel to adequately test a chain of custody or the possibility of sample contamination. Appellant’s civilian defense counsel was well prepared and did a good job of contesting both areas. The court members obviously decided that neither was an impediment to finding Specialist McAllister guilty. As defense counsel failed to demonstrate why Dr. Blake was “necessary” under this Court’s Gonzalez test, the military judge did not err. The mere possibility of assistance from an expert does not rise to the level of necessity. See Mosley, 42 MJ at 307 (Crawford, J., dissenting); Moore v. Kemp, 809 F.2d 702, 712 (11th Cir.), cert. denied, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987).
LEGAL AND FACTUAL SUFFICIENCY
Defense counsel had two theories of the case: (1) PFC Shanklin died of natural causes (a seizure); and (2) somebody murdered her but it wasn’t appellant.
Counsel’s theory that PFC Shanklin died of natural causes was premised on the fact that the victim had passed out on one or two occasions in the Hawaiian heat while standing at attention during formations. The findings of the autopsy — that the victim died as a result of suffocation due to strangulation— certainly did not advance this position.
Appellant’s second theory, that someone other than him killed PFC Shanklin, can also be put to rest by the evidence. Contrary to the defense’s assertion, the DNA evidence is not the only evidence that places appellant at the murder scene or shows that he had the opportunity to kill the victim. Appellant convicted himself without ever taking the stand.
Appellant’s statements to his fellow soldiers; past physical altercations with the victim, which included periods of choking; his futile attempts to get Staff Sergeant Rogers *283 to manufacture an alibi for him; his mysterious visit to Sergeant Grady with a box and a request for Grady to get rid of that box on the morning after the murder; as well as appellant’s highly incriminating remark (“Why, is she dead?”) when first told that “something happened to” PFC Shanklin are legally sufficient for a rational factfinder to convict appellant of PFC’s Shanklin’s murder. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); United States v. Turner, 25 MJ 324 (CMA 1987). While I share the majority’s concern with some of the minor factual discrepancies in the Court of Criminal Appeals decision, I do not find the factual-sufficiency determination by the court below to be defective.

. As an example, defense counsel asked whether those assisting the pathologist and collecting evidence were wearing gloves, medical clothing, masks, or hairnets; how many other people were in the room; whether the envelope into which the fingernails were dropped after clipping was sealed; and whether the CID agents who collected evidence at the autopsy wore medical accoutrement on their return trip to the office.

. The technique called polymerase chain reaction was invented by Kary Mullís in 1985. It enables an examiner to "find and amplify specific segments of DNA from complex mixtures.” Griffiths et al., Modem Genetic Analysis 21 (W.H. Freeman and Co., New York (1999)). “PRC is very sensitive and can detect target sequences that are in extremely low copy number in a sample.” Additionally, this technique requires no lengthy cloning procedures and "no restriction digestion of the substrate DNA is needed ..., because the primers will hone in on the appropriate sequence of native DNA.” Id. at 326.

. Defense counsel informed the judge that Dr. Conneally had not appeared at the April 23 Article 39(a), UCMJ, 10 USC § 839(a), session due to his unavailability. Although there was some uncertainty whether Dr. Conneally would testify because his rates exceeded the amount allowed under the Joint Travel Regulation, the military judge announced that "money’s not going to be the determining factor on whether he comes. If he has got pertinent information, I can order that a subpoena be issued and he testify as a $35.00 a day witness if he's got matters relevant to a case that the United States is a party. Marshals can make sure he comes.” R. 366.