# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**F.D. MITCHELL, J. MCFARLANE, M.C. HOLIFIELD**
Appellate Military Judges

**UNITED STATES OF AMERICA**

v.

**PEDRO M. BESS, JR.**
**HOSPITALMAN SECOND CLASS (E-5), U.S. NAVY**

**NMCCA 201300311**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged**: 8 March 2013.
**Military Judge**: CDR Douglas P. Barber, JAGC, USN.
**Convening Authority**: Commander, Navy Region Mid-Atlantic, Norfolk, VA.
**Staff Judge Advocate's Recommendation**: LCDR S.J. Gawronski, JAGC, USN.
**For Appellant**: Maj John J. Stephens, USMC.
**For Appellee**: LT Ian D. MacLean, JAGC, USN.

**28 October 2014**

---------------------------------------------------------
**OPINION OF THE COURT**
---------------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

MITCHELL, Chief Judge:

A general court-martial consisting of officer and enlisted members convicted the appellant, contrary to his pleas, of two specifications of attempting to commit an indecent act and four specifications of committing indecent acts, in violation of Articles 80 and 120, Uniform Code of Military Justice, 10 U.S.C. §§ 880 and 920. The appellant was sentenced to confinement for

two years and a dishonorable discharge.  The convening authority (CA) deferred and then waived automatic forfeitures for a period of six months, but otherwise approved the sentence as adjudged and, except for the dishonorable discharge, ordered it executed.

The appellant now alleges three assignments of error: 1) that the military judge abused his discretion in allowing muster reports into evidence when requested by the members during their deliberations; 2) that he was denied a fair trial when the military judge denied his request for an expert consultant in the field of eyewitness identification; and, 3) that the findings of guilt are legally and factually insufficient.

After carefully considering the record of trial, the parties' pleadings, and the appellant's assignments of error, we conclude that the findings and the sentence are correct in law and fact and that no error prejudicial to the substantial rights of the appellant was committed.  Arts. 59(a) and 66(c), UCMJ.

## Factual Summary

During the time of the charged offenses, the appellant was assigned to the Naval Branch Health Clinic Dam Neck, Virginia Beach, Virginia, as an x-ray technician.[1]  While in the performance of his duties as an x-ray technician, the appellant on several occasions told female patients that they had to be completely naked during the taking of their x-rays and on a few occasions had the patients sign a form consenting to this requirement.  At trial, it was established that patients never need to be completely naked during an x-ray and that there is no consent form for nudity in the X-ray Department at the Dam Neck or Oceana Health Clinics.

At the time of the alleged offenses, there were a total of five x-ray technicians working out of the Dam Neck and Oceana Branch Health Clinics, two of whom, including the appellant, were described as being African-American males.  One of the African-Americans, Hospitalman Third Class (HM3) P was a tall, thin, dark-complexioned, 23-year-old Haitian-American male with a thick cultural accent.  The appellant, a Hospitalman Second Class (HM2), did not have a foreign accent and was approximately twenty-six years old.  He had a lighter skin tone and a more

---

[1] Although he was assigned to the Naval Branch Health Clinic Dam Neck, he additionally worked at Branch Health Clinic Oceana, Virginia Beach, Virginia.

stocky/muscular build than HM3 P.  Additional facts relevant to the assignments of error are developed below.

## Legal and Factual Sufficiency

Witness identification of the appellant is integral to all three of his assignments of error and, taking them out of the order submitted, we begin with his allegation that the evidence presented at trial was factually and legally insufficient to support his convictions.  The appellant argues, *inter alia*, that all in-court identifications were suggestive and dated as in at least one case, the alleged misconduct happened two years earlier; and that the appellant's name was "suggested" to the alleged victims by the Government.  The appellant contends that this evidence is unreliable and therefore factually and legally insufficient to support his convictions.[2]  We disagree.

### Standard of Review

We review questions of legal and factual sufficiency *de novo.  United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).  We review the legal sufficiency of the evidence by determining "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt."  *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citing *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)).  The test for factual sufficiency is whether "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt."  *United States v. Rankin*, 63 M.J. 552, 557 (N.M.Ct.Crim.App. 2006) (citing *Turner*, 25 M.J. at 325 and Art. 66(c), UCMJ), *aff'd*, 64 M.J. 348 (C.A.A.F. 2007).  Beyond a

---

[2] The defense argues that the alleged victims' medical records listing the appellant as the x-ray tech were unreliable and that there was suggestibility during the Naval Criminal Investigative Service (NCIS) screening interviews with the victims, which led to eyewitness identification problems.  Record at 37.  Several of the victims did not have the appellant's identifying skull and crossbones x-ray marker on their x-rays.  *Id*. at 38-39.  When NCIS first started investigating, they conducted screening interviews, where the interviewees verbally described their x-ray tech.  *Id*. at 40.  NCIS never conducted a visual identification through a photographic or in-person line-up.  *Id*.  The defense specifically took issue to PG, LS3 DB, and AM2 AL's identifications of the appellant, which had taken place at the Article 32 hearing after the NCIS screening interviews, and noted that BS had not yet visually identified the appellant since she had testified via phone at the Article 32 hearing.  *Id*. at 38, 41, 45.

reasonable doubt, however, does not mean that the evidence must be free from conflict. *Id.*

Discussion and Analysis

The appellant does not dispute that he was the x-ray technician for three of the alleged victims in this case: OS[3], Lance Corporal (LCpl) JE, and LCpl AA. Appellant's Brief of 10 Feb 2014 at 38. We therefore outline all charges to which the appellant was found guilty and review in greater depth the identifications of the appellant by Logistics Specialist Third Class (LS3) DB, Aviation Structural Mechanic Second Class (AM2) AL, PG, and BS.

LS3 DB (Charge I, Specification 1)

LS3 DB went to the Branch Medical Clinic Oceana for hip x-rays on the morning of 10 March 2011. An older, white gentleman was her x-ray tech at that time, and he gave her two gowns to wear for the x-rays because she was not wearing shorts. The x-rays could not be completed at that time.

Around 1600, she went back to the x-ray department. The appellant first told LS3 DB that she needed to change into a gown, but later came back to say she must be completely naked for the x-rays. The appellant told her that she would have to sign a form consenting to remove all of her clothing and that he did not have a female stand-by available. LS3 DB stated she was uncomfortable with being naked because she had been able to wear a gown along with her undergarments and a t-shirt in preparation for the x-ray that morning. The appellant left, then came back and stated that the type of x-ray had been changed so that she did not need to be nude. The x-rays were then taken.

At trial, LS3 DB described her second x-ray tech as an African-American second class petty officer, who was around six feet in height and of stocky build. He did not have a foreign accent. In her original statement to the Naval Criminal Investigative Service (NCIS) in November 2011, LS3 DB had also identified her x-ray tech as an African American male HM2, who appeared to be in his twenties. At the Article 32, LS3 DB testified in person and identified the appellant as the x-ray tech in question, as she did again at trial. LS3 DB's medical records indicate her x-rays were performed after 1647 by the appellant. After 1600, per the Branch Medical Clinic's standard

---

[3] The appellant was acquitted on all charges concerning OS.

operating procedure, only one x-ray tech is present at the Oceana clinic.

LCpl AA (Charge I, Specification 2)

LCpl AA had x-rays at the Branch Clinic Dam Neck due to a snowboarding injury and went to Oceana to pick them up. At Oceana, the appellant told her she needed two sets of additional x-rays: one wearing shirt and shorts and the other completely undressed. The appellant then told her that the first set of x-rays were no longer necessary and to get completely undressed. LCpl AA argued with him about the necessity of being undressed, but the appellant insisted that she needed to be "completely naked." Record at 703. After further pushback on the issue, the appellant told her he would print out her original x-rays. LCpl AA identified the appellant by name and pay grade at the Article 32 investigation held from 12-13 June 2012, and the appellant acknowledged that LCpl AA was one of his patients in a statement to a command investigator. Appellate Exhibit CVI at 4.

PG (Charge II, Specification 1)

PG's doctor ordered x-rays because she was having back and neck pain after a car accident. An older white male tech and appellant were waiting for her in the x-ray room. The older gentleman told her to remove her bra and jacket, but leave on her tank top, for her x-rays.[4]

The older gentleman left and the appellant told her that he needed to take "more invasive" x-rays because her "doctor wanted to check out every part of [her] body." Record at 764. After the appellant told her to get completely undressed, the appellant took what PG believed to be several x-rays of her in different positions while she was naked, including purported chest and pelvic x-rays. As she lay naked on the examination table, the appellant had her put her feet together with her legs splayed open and place her chest against the x-ray table with her hips propped on a block, her feet together, and her back arched.

---

[4] At trial, PG was cross-examined on her October 2011 statement to NCIS, where she stated that the white male x-ray tech was present during the original x-rays and that she was topless at that time. AE LXXX at 2. At trial, she stated that she might have been confused when she told that to the agent and that the white male tech was not present while she was naked. Record at 788, 792-93.

PG's medical records presented at trial show no pelvic x-rays. Another radiology tech testified that it is possible for a tech to cause the x-ray machine to make sounds without actually capturing an image and that x-rays not sent to a doctor are purged at the end of the month.

In her statement to NCIS, she stated that her second x-ray tech was a black male who was approximately 5'9" in height and no more than 25 years old. PG testified in person at both the Article 32, UCMJ, hearing and at trial, and identified the appellant as the x-ray tech in question. She did not recognize a picture of HM3 P when shown one at the Article 32 hearing. At trial, she said she remembered that the tech's name started with "B" when NCIS first questioned her. PG's medical records also indicate her x-rays were performed after 1709 by the appellant on 24 February 2011.

AM2 AL (Charge II, Specification 2)

AM2 AL's flight surgeon ordered x-rays in order to refer her to a chiropractor. She went to the x-ray department at Oceana and a female tech took x-rays of her back while she was lying down. On the evening of 25 February 2011, AM2 AL returned to the x-ray department at Oceana because her doctor needed x-rays of her back while she was standing.

The appellant gave her a gown and then told AM2 AL to wear nothing except for the gown. After she had changed, the appellant came back into the room and told her that the doctor had requested the x-rays be taken without a gown. While he was gone, she took off the gown as directed, leaving her completely naked. He came back in and gave her a form that appeared to be from the doctor and that said the x-rays had to be taken with no gown or clothing on. The appellant then took a series of x-rays while she was standing and completely naked. Throughout that process, her breasts, buttocks, and vaginal area were exposed. She stated that she was in the examination room for approximately 20 minutes.

In AM2 AL's NCIS statement in November 2011, she described her second x-ray tech at the Oceana clinic as a "black male . . . HM2." AE XXV at 30. At the Article 32 hearing, she testified in person and identified the appellant as her x-ray tech. At trial, she stated she remembered specifically that the tech was an HM2 and that he was a tall, black male, and identified the appellant as that person. AM2 AL's medical records indicate her

6

x-ray was performed around 1800 by the appellant.  Prosecution Exhibit 2 at 4.

LCpl JE (Charge II, Specification 3)

LCpl JE went to get x-rays of her hip at the Dam Neck clinic.  The first day, her x-ray tech was an African-American male with a "Jamaican type accent," and she wore paper shorts and a t-shirt during the x-rays.  She came back the next day for additional x-rays.  At that time, the appellant told her that she would have to be nude and sign a consent form.  She removed all of her clothing and then put on a gown that was on the examination table.  The appellant then told her she would have to take the gown off.  As she removed the gown the appellant had her lay chest against the x-ray table with her hips propped on a block, her feet together with her legs splayed open, and her back arched.  In July 2011, JE described this conduct in a statement to her command and identified the appellant by name.  AE CVI at 3.

At trial, a female nurse testified that she had worked with the appellant at Dam Neck and remembered acting as a standby for a female patient with the same last name as LCpl JE.  She testified that she was present for the entire procedure and that the patient's private areas were not exposed during the procedure.  LCpl JE testified that no one was present with the appellant during her x-rays.

BS (Charge II, Specification 4)

At the time of the incident in May 2011, BS was an enlisted Sailor attempting to cross-rate to air crew.  As part of that process, she had to have a chest x-ray at the Oceana clinic. The appellant told her that she needed to remove her blouse, t-shirt, and bra in order to take chest x-rays.  During some of the x-rays, her breasts were exposed.

In BS's statement to NCIS in November 2011, she described her x-ray tech as a black male who appeared to be in his twenties and of approximately her height of 71 inches.  At the Article 32, BS testified via telephone.  She described her x-ray tech as an African-American male who was around 5 feet 11 inches to 6 feet in height.  Although she did not remember his name, she remembered that he did not have a foreign accent.  Trial counsel never asked her to identify the appellant as her x-ray technician at trial, and she stated she believed that her x-ray tech was a third class petty officer.  However, BS's medical

7

records indicate her x-rays were performed by the appellant on the morning of 4 May 2011.  Her x-rays also display the appellant's x-ray marker "PMB" with skull and crossbones.

In appellant's case, the evidence of his guilt was overwhelming.  Each victim's allegations and in-court identifications (with the exception of BS) were supported by other evidence that the appellant was her x-ray tech.  In addition, each victim's testimony at trial supported the charges resulting in convictions.  We find unpersuasive the appellant's argument that the identification of the appellant as the perpetrator of these offenses was somehow suggested by the Government.  We likewise do not find evidence that the in-court identifications of the appellant were unreliable.

After carefully reviewing the record of trial and considering the evidence in the light most favorable to the prosecution, we are convinced that a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt.  Furthermore, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced beyond a reasonable doubt of the appellant's guilt.

## Expert Assistance

Somewhat related to the previous AOE as it pertains to the reliability of in-court identifications, we next consider the appellant's contention that he was denied a fair trial when the military judge denied his request for an expert consultant in the field of eyewitness identification.

We review a military judge's ruling on a request for expert assistance for an abuse of discretion. *United States v. Gunkle*, 55 M.J. 26, 32 (C.A.A.F. 2001).  An appellant must demonstrate necessity to be entitled to expert assistance provided by the Government.  *Id.* at 31.  Necessity requires more than a mere possibility the requested expert would be of assistance.  *Id.* Rather, the accused must demonstrate a reasonable probability "'both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial.'"  *Id.* at 31-32 (quoting *United States v. Robinson*, 39 M.J. 88, 89 (C.M.A. 1994)) (additional citation omitted).  The Court of Appeals for the Armed Forces has adopted a three-pronged test for determining necessity: "(1) Why is the

8

expert needed? (2) What would the expert accomplish for the defense? and (3) Why is the defense counsel unable to gather and present the evidence that the expert assistant would be able to develop?"  *Id.* at 32 (citing *United States v. Ford*, 51 M.J. 445, 455 (C.A.A.F. 1999)) (additional citations omitted).

"In determining whether the military judge abused his discretion in denying the defense's request for an expert consultant, each case turns on its own facts."  *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005).  For this court to reverse for an abuse of discretion, there must be "far more than a difference in . . . opinion" with the trial court.  *Id.* (quoting *United States v. Travers*, 25 M.J. 61, 62-63 (C.M.A. 1987)).  "A military judge abuses his discretion when his findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law."  *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008) (citations omitted).

As a preliminary matter, we find the military judge's findings of fact devoid of error and adopt them as our own.  We also find that his conclusions of law were not "influenced by an erroneous view of law."  *Id.*; CVI at 8.  Additionally, as discussed below, we find that the appellant failed to satisfy any of the three prongs to demonstrate necessity for the requested expert assistance.

First, the appellant's identity was not an issue in significant controversy because all of the crimes of which the appellant was convicted occurred during medical examinations by a male x-ray tech of African-American decent, either at Oceana or Dam Neck.  The only two possible suspects were HM3 P and the appellant.  Each victim had substantial time with the appellant in a clinical setting and had conversations with him.  LCpl JE and LCpl AA identified the appellant by name.  LS3 DB, AM2 AA, BS, and PG's medical records connect the appellant to the time period of the charged events.  Additionally, two of those four identified the tech as an "HM2" prior to the Article 32 hearing. Therefore, the appellant's contention that the victims' eye-witness identifications of him were faulty is untenable.  *See generally Neil v. Biggers*, 409 U.S. 188, 199-200 (1972) (articulating five-factor test for determining the admissibility of pretrial and in-court identifications, which includes the witness' opportunity to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of

9

witness' prior description of criminal, the level of certainty of the witness at confrontation, and the length of time between crime and confrontation).

Second, the defense failed to establish what the expert would accomplish for the appellant. At best, the defense articulated only a mere possibility of assistance from the requested expert, which does not provide the requisite showing of necessity. *Gunkle*, 55 M.J. at 31.

Third, the defense failed to establish why counsel was unable to gather and present the evidence that the expert would be able to develop. This aspect of the trial judge's ruling is vindicated by trial defense counsel's able cross-examination of each prosecution witness, argument regarding identification issues in closing, and motion to suppress the Article 32 eyewitness identifications of the appellant.[5]

Finally, we conclude that denial of the appellant's request for expert assistance did not "result in a fundamentally unfair trial." *Id.* at 31-32. Accordingly, we find that the military judge did not abuse his discretion when he denied the appellant's motion to compel production of an expert consultant in eyewitness identification.

**Hearsay and Testimonial Evidence**

Lastly, we consider the appellant's argument that the military judge erred when he admitted muster reports the members requested during their deliberations over defense objection. He first contends that the muster reports do not satisfy the requirements of a record of regularly conducted activity under MILITARY RULES OF EVIDENCE 803(6), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). He next argues that the muster reports are testimonial and that admitting those records during deliberations without the ability to confront the records custodian or present further argument in front of the members

---

[5] The defense also made a motion to suppress LS3 DB, AM2 AL, and PG's eyewitness identifications of the appellant at the Article 32 hearing and to prevent those witnesses from identifying the appellant at trial. AE XXV; Record at 61. That motion came down to the question of whether the appellant's presence at the defense table at the Article 32 hearing, combined with his being the only African-American at the table at the time of the identification, constituted an unnecessarily suggestive identification procedure. AE CVI at 10. The military judge also denied that motion, finding that the Government proved by a preponderance of the evidence that the identifications were reliable under the circumstances. *Id.* at 11.

violates his constitutional right of confrontation.  We disagree with both contentions.

The appellant's arguments rely upon his contention that at least four of the victims inaccurately identified him as the perpetrator, thereby making the muster reports uniquely important because they corroborate his presence at the x-ray clinic on many of the charged dates.

Muster Reports

During the appellant's sworn testimony at trial, the trial counsel asked him if he was aware of muster logs maintained by the administrative department, and the appellant responded that he was.  Record at 1227.  Trial counsel did not mark those logs as prosecution exhibits but used them to cross-examine the appellant on how he was marked present on the charged dates of 24 February, 10 and 17 March, 13 April, and 4 May 2011.  The trial counsel also cross-examined the appellant on the logs marking him as a late stay, meaning the afternoon shift, on 24 February and 10 March.  In his closing argument, the civilian defense counsel argued that the Government must not have had the muster reports because the trial counsel never marked them as an exhibit.  *Id*. at 1366.

While the members were deliberating, they returned and asked for additional documentary evidence that was mentioned in closing arguments, including the muster reports.  In an Article 39(a), UCMJ, session regarding the admissibility of the muster reports, the military judge allowed only those referenced during the appellant's cross examination.

The trial counsel called Ms. W, an administrative assistant at Branch Medical Clinic Oceana in charge of personnel matters, to authenticate the reports.  She testified that the muster reports were created by 0800 every morning by administrative personnel and that she maintained those reports in the regular course of business.  She printed off the muster reports upon trial counsel's request.  Because the dates of the musters were listed in each document's file name and not in the text of the document, she hand-wrote the corresponding date on each printout.

The defense objected to the reports as not generated or maintained in the regular course of business and as unreliable.  Record at 1467-68.  The military judge found that the reports were sufficiently reliable and were generated in the regular

11

course of business.  The members received those documents and returned with their verdict approximately thirty minutes later.

Records of Regularly Conducted Activity

We first address the appellant's argument that the muster reports were improperly admitted as records of regularly conducted activity.  We review a military judge's decision to admit evidence under an abuse of discretion standard.  *United States v. Barnett*, 63 M.J. 388, 394 (C.A.A.F. 2006).  This standard is a "'strict one'" and requires that the challenged action be "'arbitrary, fanciful, clearly unreasonable, or clearly erroneous'" in order for relief to be granted.  *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (quoting *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010)).  We find the military judge did not abuse his discretion in admitting the muster reports.

MIL. R. EVID. 803(6) recognizes the business record exception to the general rule precluding the use of hearsay evidence.[6]  Generally, such records are admissible if prepared in the regular course of business and when recorded by a person who has knowledge of the event recorded, at or near the time of the event.  *United States v. Harris*, 53 M.J. 514, 521 (N.M.Ct.Crim.App. 2000), *aff'd*, 55 M.J. 433 (C.A.A.F. 2001).  The proponent of the records need only show by a preponderance of the evidence that the records meet these requirements to establish their admissibility.  *United States v. Tebsherany*, 32 M.J. 351, 355 (C.M.A. 1991).

Upon review of the evidence on this issue, we find the standard has been met.  The muster logs were authenticated by an administrative assistant at Branch Medical Clinic Oceana who was in charge of personnel matters.  She testified that the muster reports were created every morning by administrative personnel and that she maintained those reports in the regular course of business.  Accordingly, we find that the military judge did not abuse his discretion in admitting the muster logs.

Testimonial Hearsay

We now turn to whether the muster reports are testimonial as contemplated by *United States v. Crawford*, 541 U.S. 36 (2004) and find that they are not.  *Rankin*, 64 M.J. at 352, outlines

---

[6] We note the text of MIL. R. EVID. 803(6) specifically lists "morning reports and other personnel accountability documents" as "normally admissible" under this rule.

three factors to differentiate between testimonial and non-testimonial hearsay: (1) whether the statement was elicited by or made in response to law enforcement or prosecutorial inquiry, (2) whether the statement involved "more than a routine and objective cataloging of unambiguous factual matter," and (3) whether the primary purpose for "making, or eliciting, the statement was the production of evidence with an eye toward trial." In applying these factors, the goal is "'an objective look at the totality of the circumstances surrounding the statement to determine if the statement was made or elicited to preserve past facts for a criminal trial.'" *United States v. Harris*, 66 M.J. 781, 788 (N.M.Ct.Crim.App. 2008) (quoting *United States v. Harcrow*, 66 M.J. 154, 158 (C.A.A.F. 2008)) (additional citations omitted).

Here, the muster reports were created every day and preserved in the course of business by the command. They were created for personnel reasons and not for the purpose of trial or prosecution. The muster logs contained a catalogue of unambiguous facts: each person's work schedule and presence or absence on that date. The muster reports were not created with an eye toward trial of the appellant. Ms. W's hand written notes on the documents merely reflected the document's pre-existing title, which did not appear in the text of the document.

As a result, the muster reports were not testimonial and their admission into evidence did not violate the appellant's Sixth Amendment right to confrontation. *See Harris*, 66 M.J. at 789. Furthermore, the appellant did have the opportunity to cross-examine the records custodian and present the testimony of an additional witness regarding the reliability of those documents before the military judge admitted them into evidence. *See* Record at 1451. Finally, the muster reports had already been mentioned and explained during the appellant's cross-examination.

In view of the strength of the evidence against the appellant, even if the muster reports were improperly admitted, the error was harmless beyond a reasonable doubt. *See Harris*, 66 M.J. at 789; *see also United States v. Brewer*, 61 M.J. 425, 432 (C.A.A.F. 2005). The muster reports showed only what had already been presented at trial through the appellant's cross-examination. Each victim provided an identifying description of the appellant in her statement to NCIS. All the victims in question had medical records listing the appellant as their x-ray tech on the charged dates. LS3 DB, AM2 AL, and PG

13

identified the appellant as their x-ray tech at the Article 32 hearing and in-court and had their x-rays taken after 1600, when generally only one x-ray tech was present at the Oceana clinic. BS remembered that her x-ray tech did not have a foreign accent, and her x-rays displayed the appellant's specific x-ray marker "PMB" with skull and crossbones. We therefore decline to grant relief.

## Conclusion

Accordingly, the findings and the sentence as approved by the CA are affirmed.

Senior Judge MCFARLANE and Judge HOLIFIELD concur.


For the Court



R.H. TROIDL
Clerk of Court


14