CORRECTED
UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS
Washington, D.C.

UNITED STATES

v.

Andrew L. DALY
Boatswain's Mate First Class (E-6), U.S. Coast Guard

CGCMS 24437

Docket No. 001-62-10

14 June 2010

Special Court-Martial convened by Commander, Coast Guard Group Port Angeles. Article 39(a), UCMJ, session at Seattle, Washington, on 1 March 2010.

| | |
|---|---|
| Military Judge: | CDR Richard E. Batson, USCG |
| Trial Counsel: | LCDR Marianne M. Gelakoska, USCG |
| Assistant Trial Counsel: | LCDR Anthony R. Owens, USCG |
| Civilian Defense Counsel: | Mr. Stephen H. Carpenter, Jr. |
| Military Defense Counsel: | LT Natasha T. Bode, JAGC, USN |
| Appellate Government Counsel: | LT Herbert C. Pell, USCGR |
| | CAPT Stephen P. McCleary, USCG |

BEFORE
McCLELLAND, TOUSLEY & McTAGUE
Appellate Military Judges

McCLELLAND, Chief Judge:

This is a Government appeal under Article 62, Uniform Code of Military Justice (UCMJ). On 5 March 2010, the military judge dismissed the single charge under Article 134, UCMJ, and its four specifications. The Government requested reconsideration on17 March 2010, which the military judge summarily denied on 26 March 2010. The Government gave notice of appeal on 29 March 2010. On 17 May 2010, the Government filed with this Court the record of trial, which had been authenticated on 2 May 2010. The Government filed its brief on 7 June 2010.

Under Article 62, we act only with respect to matters of law, which we review *de novo*. Having considered the Government's brief and the record, we affirm.

**Proceedings Below**

Appellee was charged under Article 134, UCMJ, the "general article," which makes punishable "all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital". As originally charged, each of the four specifications alleged an offense occurring between March 2008 and July 2009 in the following form:

> … did on between or about (*date*) and on or about (*date*), violate a lawful general order, to wit: Commandant Instruction M1000.6A, Personnel Manual, paragraph 8.H.2.f., by wrongfully engaging in romantic relationships with subordinate members of his command, to wit: (*one or more sexual acts*) with (*named female E-2 or E-3*), then knowing that said (*same named female*) was subordinate to the said Boatswain's Mate First Class Daly, and that such conduct was prejudicial to the good order and discipline in the armed forces.

On 4 February 2010, subsequent to two R.C.M. 802 conferences at which the discussion included the form of the charges and the doctrine of preemption, the specifications were amended by deleting from each the clause alleging violation of a lawful general order. (Appellate Ex. XIII at 4.) The specifications as amended were in the following form:

> … did on between or about (*date*) and on or about (*date*), wrongfully engaging [sic] in romantic relationships with subordinate members of his command, to wit: (*one or more sexual acts*) with (*named female E-2 or E-3*), then knowing that said (*same named female*) was subordinate to the said Boatswain's Mate First Class Daly, and that such conduct was prejudicial to the good order and discipline in the armed forces.

Appellee moved to dismiss Charge I and its four specifications for failure to state an offense and for violating his Fifth Amendment right to due process and his First Amendment right to freedom of association.[1] The motion was argued at an Article 39(a), UCMJ, session on 1 March 2010.[2] Appellee's arguments were based on 8.H. of the Coast Guard Personnel Manual,

---

[1] The military judge did not consider the First Amendment issue, and neither do we.

[2] The Article 39(a) session appeared to be an arraignment session. At the usual point for the arraignment, the military judge said, "Petty Officer Daly, at this point I'm going to ask you how you plead to the Charges and

2

COMDTINST M1000.6A (PERSMAN).[3]  This portion of the Personnel Manual, entitled "Interpersonal Relationships within the Coast Guard," offers wide-ranging guidance on various kinds of relationships among personnel and their various effects, good and bad, on work environment, professional development, good order and discipline, and other matters.  Relevant to this case, it creates three categories: acceptable relationships, unacceptable relationships and conduct, and prohibited relationships and conduct.[4]

PERSMAN paragraph 8.H.2.g sets forth three types of relationships or conduct and explicitly prohibits them, and goes on, "This provision is a punitive general regulation, applicable to all personnel subject to the Uniform Code of Military Justice without further implementation.  A violation of this provision is punishable in accordance with the UCMJ."

PERSMAN paragraph 8.H.2.f describes several circumstances of "romantic" relationships[5] and calls them unacceptable, including where the parties "have a supervisor and subordinate relationship (including periodic supervision of duty section or watchstanding personnel)" and where they "are assigned to the same small shore unit (less than 60 members)".  Paragraph 8.H.2.d.3.c says that resolution of an unacceptable relationship is "normally administrative."  PERSMAN section 8.H.6, "Resolving Unacceptable Relationships," discusses many administrative approaches to addressing unacceptable relationships, including "a direct order to terminate a relationship," paragraph 8.H.6.c, and "direct[ion] to end a relationship," paragraph 8.H.6.d.  It concludes with paragraph 8.H.6.g, "Disciplinary Action": "Non-judicial punishment or courts-martial may address fraternization or other unlawful or prohibited relationships or conduct."

Before the military judge, the Government alleged (Appellate Ex. IX at 8), and Appellee acknowledged the possibility (Appellate Ex. VII at 4, 6), that Appellee's conduct was "unacceptable" in that he and each of his sexual partners were assigned to the same small shore

---

Specifications thereunder.  But before we do that, any motion to dismiss … should be made at this time."  This was arguably not an arraignment. *See United States v. Edmond*, 37 M.J. 787 (C.G.C.M.R. 1993) at fn 1.

[3] Both parties and the military judge invoked PERSMAN 8.H.  Without saying so, clearly the military judge took judicial notice of it.  We do so as well.  A copy of it is attached to this opinion as an appendix.

[4] In addition, 8.H.4 affirms the criminal offense of fraternization as defined in Manual for Courts-Martial (MCM), United States (2008 ed.), Pt. IV, ¶ 83.

[5] Although "romantic" is not defined, it surely includes sexual activity.

unit having less than sixty members. However, Appellee argued that PERSMAN 8.H. made it clear that this conduct was not prohibited, only unacceptable, and that he could not be prosecuted for the conduct, but could only suffer administrative consequences for it. The Government responded that the qualified statement in PERSMAN paragraph 8.H.2.d.3.c, that resolution of an unacceptable relationship is *normally* administrative, leaves open the possibility of prosecution in a non-normal case, and, the Government asserted, the facts of this case were not normal.

The military judge ruled that the terms of the Personnel Manual clearly provide that conduct such as Appellee's alleged conduct subject a member to administrative but not criminal resolution, and declared that qualifying this policy with the word "normally" was "insufficient to show that an accused is on notice that his conduct is subject to criminal sanction." (Appellate Ex. XIII at 10.) Therefore, "there was no due process 'fair notice' that the accused's conduct was made subject to criminal sanction." (Appellate Ex. XIII at 11.) Accordingly, he granted the motion to dismiss.

In its request for reconsideration, the Government pointed out that an order to terminate a relationship, noted by the military judge as a possible administrative avenue to address an unacceptable relationship under PERSMAN section 8.H.6, would open up the possibility of prosecution if the order were not obeyed, i.e. if the relationship were not terminated. From this, the Government urged the military judge to acknowledge that criminal sanctions are available under certain circumstances for unacceptable relationships. The Government further contended that the facts and circumstances as revealed in an investigation indicated that Appellee "could -- and did -- understand that his *unacceptable relationship* with subordinate members of his command *might* violate the U.C.M.J." (Appellate Ex. XIV at 13.) Therefore, the Government argued, he "had notice satisfying the requirements of due process of law." (*Id.*)

The Government also urged, in favor of reconsideration, that notice that conduct is wrongful can be found in military custom, citing *United States v. Vaughan*, 58 M.J. 29, 31-33 (C.A.A.F. 2003). The military judge had observed that fair notice that an act is a crime may be found in military custom and usage, among other sources, citing *Vaughan*. The Government argued that the Coast Guard's established custom that certain relationships are unacceptable, of

which Appellee was aware, subjected his relationships to criminal sanction, and that, contrary to the military judge's ruling, the word "normally" did allow for exceptions where criminal sanctions could be brought to bear.

As part of its motion for reconsideration, the Government requested an opportunity to present evidence and oral argument. As already noted, the military judge rejected the Government's request for reconsideration.

## Discussion

Before this Court, the Government renews its arguments that Appellee was aware that his conduct could subject him to criminal sanctions and that custom can provide notice of wrongfulness, and further argues that the absence of words making a regulation punitive does not preclude reference to the regulation in determining whether certain conduct may be prosecuted under Article 134. As it did below, the Government emphasizes the serious prejudice to good order and discipline that resulted from Appellee's conduct, implying that the prejudice to good order and discipline was so great that it tended to prove the criminality of that conduct.

It appears that the Government's theory in this case was that the Personnel Manual, by disapproving of conduct it labeled unacceptable, made it "wrongful" such that, when combined with prejudice to good order and discipline, the conduct could be made a crime under Article 134. We reject this theory. It is certainly true that a word of criminality such as "wrongfully" is essential to an adequate specification. *See* Rule for Courts-Martial 307(c)(3) Discussion (G)(ii), MCM. However, there is more to criminality than the mere word "wrongfully." Wrongful in the sense of disapproved is not enough. For conduct to be wrongful for the purpose of Article 134 requires notice that the conduct is criminal. Put another way, in order to be prosecuted under Article 134, UCMJ, a servicemember must be on fair notice that his or her conduct was punishable. *United States v. Bivins*, 49 M.J. 328, 330 (C.A.A.F. 1998) (citing *Parker v. Levy*, 417 U.S. 733, 756 (1974)); *accord United States v. Rogers*, 54 M.J. 244, 256 (C.A.A.F. 2000); *United States v. Vaughan*, 58 M.J. 29, 31 (C.A.A.F. 2003); *United States v. Saunders*, 59 M.J. 1, 6 (C.A.A.F. 2003).

The Government acknowledges that due process requires fair notice that an act is forbidden and subject to criminal sanction, and correctly points out that such notice can be gleaned, *inter alia*, from military custom, citing *Vaughan,* 58 M.J. at 31-33 and *Rogers*, 54 M.J. at 256-57. "A breach of a custom of the service may result in a violation of clause 1 of Article 134." MCM, Pt. IV, ¶ 60c(2)(b).

In this case, resort to custom is futile because custom has been supplanted by PERSMAN 8.H.[6] 8.H. specifies "prohibited" relationships and conduct, which incur criminal liability. Other specified relationships and conduct, called "unacceptable," are likely to lead to administrative sanctions. By negative inference, unacceptable relationships and conduct apparently do not incur criminal liability in themselves.

The Government makes much of the qualified statement in PERSMAN 8.H.2.d.3.c that the resolution of an unacceptable relationship is "normally" administrative, arguing that criminal liability is therefore not foreclosed. If the issuer of PERSMAN 8.H. intended to give notice of criminality of unacceptable relationships, this was not the best way to do it.[7] Rather, in effect, 8.H. appears to give servicemembers notice of the noncriminality of unacceptable relationships for the purpose of Article 134.

To confirm this impression, we undertake further scrutiny of PERSMAN 8.H. Notably, Paragraph 8.H.5.b provides:

> Personnel finding themselves involved in or contemplating unacceptable relationships should report the situation and seek early resolution from their supervisor, commanding officer, officer in charge, command enlisted advisor, or Coast Guard chaplain. Any potential conflict with Coast Guard policy should be addressed promptly. Commands are expected to assist members in understanding Coast Guard policy requirements and resolving conflicts. Bringing an unacceptable relationship to early Command attention will increase the opportunity for early, positive resolution.

The phrase "Personnel finding themselves involved in or contemplating unacceptable relationships" acknowledges the common human phenomenon of "falling in love," which can

---

[6] *See* MCM, Pt. IV, ¶ 60c(2)(b), noting, "Many customs of the service are now set forth in regulations of the various armed forces." PERSMAN Paragraphs 8.H.1.d and 8.H.1.e explicitly acknowledge custom as background for what follows. Specific customs are described later in 8.H.

[7] As the directive is ambiguous on the point, regulatory history might have been useful.

happen regardless of a person's professional intentions and often cannot be controlled at inception. The later material in section 8.H.6 offers various alternative resolutions of unacceptable relationships. The overall policy appears clearly to avoid criminalization in favor of practical solutions as far as possible. This is understandable, as criminalization, or even uncertainty, would create an enormous incentive to hide such relationships, allowing their many detriments to good order and discipline to blossom, as well as possibly incurring loss of productivity of the parties, who would have to divert some attention to keeping their secret. It would also risk the downfall of otherwise valuable servicemembers whose value to the service might have continued if a solution had been found. It seems eminently reasonable that 8.H. should create a noncriminal "safe harbor," readily understandable to servicemembers, for persons "finding themselves involved in or contemplating unacceptable relationships."

Accordingly, we interpret PERSMAN 8.H. as giving servicemembers notice of the noncriminality of unacceptable relationships for the purpose of Article 134. If we did otherwise, we would destroy the "safe harbor."

This is not to say that such a relationship cannot become the basis of a charge under the UCMJ. For example, if, as contemplated by PERSMAN paragraphs 8.H.6.c and 8.H.6.d, a person were ordered to terminate a relationship, violation of that order could be charged under Article 92, which makes punishable violations of orders and derelictions of duty.[8] Similarly, if Appellee had a duty to avoid unacceptable relationships, dereliction of that duty could be charged under Article 92. (This possibility of criminal liability, based not purely on "unacceptable relationship" but on one or more additional factors, might be the reason the word "normally" was used.)

The Government argues vigorously that nonpunitive regulations can give notice of criminality and therefore provide the basis of a charge under the general article, citing *Vaughan* and *Rogers*. The argument misses the mark here because in those cases, the directives lacked the indicia of a punitive regulation but did not negate criminality, whereas here, the directive gives

---

[8] There would be no reason to allege violation of such an order under Article 134, and the preemption doctrine, MCM, Pt. IV, ¶ 60c(5)(a), provides encouragement not to do so.

notice of noncriminality. Similarly, the argument that custom can suffice to give notice of criminality is unavailing because custom cannot criminalize conduct of which a directive negates criminality. *See* MCM, Pt. IV, ¶ 60c(2)(b) ("No custom may be contrary to existing law or regulation.").

In short, we hold that an unacceptable relationship, without more, does not support criminal liability under Article 134. Accordingly, we affirm the military judge's ruling.[9]

The Government argues that the military judge erred in failing to grant the Government an evidentiary hearing on the motion for reconsideration. Aside from evidence of prejudice to good order and discipline, which would not be relevant on the question of fair notice of criminality, the proposed evidence apparently would tend to show that Appellee knew his conduct was inappropriate. We agree with the military judge that the issue he was deciding was an issue of law. Since we hold that PERSMAN 8.H. negates criminality of unacceptable relationships for the purpose of Article 134, Appellee's knowledge is irrelevant.[10]

The Government's appeal is denied.

Judges TOUSLEY and MCTAGUE concur.



For the Court,

Amber K. Riffe
Deputy Clerk of the Court

---

[9] To the extent that the military judge's ruling precluded all prosecution based on an unacceptable relationship, it went too far, as our discussion above makes clear.

[10] While it could be argued that Appellee's knowledge would rebut his argument that prosecution (as applied to him) would violate the right to due process, there is nothing about the evidence of his knowledge, as proffered by the Government, that indicates he knew his conduct could subject him to criminal prosecution as opposed to administrative sanctions.

# 8.H.  Interpersonal Relationships within the Coast Guard

## 8.H.1.  General

### 8.H.1.a.  Coast Guard Values

The Coast Guard attracts and retains highly qualified people with commonly shared values of honor, respect and devotion to duty.  These values anchor our cultural and Service norms and serve as a common foundation for our interpersonal relationships within the Coast Guard.

### 8.H.1.b.  Mission Success

We interact, communicate and work together as teams to accomplish our missions. Indeed, mission success depends on cultivating positive, professional relationships among our personnel.  An environment of mutual respect and trust inspires teamwork, assures equal treatment, and grants Service members the opportunity to excel.

### 8.H.1.c.  Leadership and Military Discipline

Professional interpersonal relationships always acknowledge military rank and reinforce respect for authority.  Good leaders understand the privilege of holding rank requires exercising impartiality and objectivity.  Interpersonal relationships which raise even a perception of unfairness undermine good leadership and military discipline.

### 8.H.1.d.  Custom and Tradition

The Coast Guard has relied on custom and tradition to establish boundaries of appropriate behavior in interpersonal relationships.  Proper social interaction is encouraged to enhance unit morale and esprit de corps.  Proper behavior between seniors and juniors, particularly between officers and enlisted personnel, enhances teamwork and strengthens respect for authority.

### 8.H.1.e.  Officers and Senior Enlisted

By long standing custom and tradition, commissioned officers, including warrant officers, have leadership responsibilities extending across the Service.  Likewise, chief petty officers (E-7 to E-9) have a distinct leadership role, particularly within their assigned command.  Both provide leadership not just within the direct chain of command, but for a broader spectrum of the Service.  Due to these broad leadership responsibilities, relationships involving officers or chief petty officers merit close attention.

---

## 8.H.2.    Policy

### 8.H.2.a.    Professional Work Environment

Coast Guard policy is to sustain a professional work environment which fosters mutual respect among all personnel, and in which decisions affecting personnel, in appearance and actuality, are based on sound leadership principles. Commanding Officers, officers-in-charge, and supervisors are expected to provide an environment which enhances positive interaction among all personnel through education, human relations training, and adherence to core values.

### 8.H.2.b.    Positive Social Interaction

Coast Guard policy on interpersonal relationships has been crafted to be as gender-neutral as possible. However, this approach may obscure one important issue: the fundamental principle that interpersonal activities which are appropriate among men or among women are likewise appropriate among men and women. Positive social interaction among men has proved beneficial to the individuals and the organization in the past, and women should be afforded equal opportunity to participate in these activities. Women must not be insulated or isolated from proper professional and social activities if the Coast Guard is to benefit from the full measure of their contributions.

### 8.H.2.c.    Acceptable Personal Relationships

As people work together, different types of relationships arise. Professional relationships sometimes develop into personal relationships. Service custom recognizes that personal relationships, regardless of gender, are acceptable provided they do not, either in actuality or in appearance:

1. Jeopardize the members' impartiality,

2. Undermine the respect for authority inherent in a member's rank or position,

3. Result in members improperly using the relationship for personal gain or favor, or

4. Violate a punitive article of the UCMJ.

### 8.H.2.d.    Assessing the Propriety

The great variety of interpersonal relationships precludes listing every specific situation that members and commands may encounter. While some situations are clearly discernible and appropriate action is easily identified, others are more complex and do not lend themselves to simple solutions. Evaluating interpersonal relationships requires sound judgment by all personnel. Factors to consider in assessing the propriety of a relationship include:

1.  The organizational relationship between the individuals: whether one member can influence another's personnel or disciplinary actions, assignments, benefits or privileges;

2.  The relative rank and status of the individuals: peers, officer and enlisted, CPO and junior enlisted, supervisor and subordinate, military and civilian, instructor and student; and

3.  The character of the relationship; e.g., personal, romantic, marital.

    a.  Personal relationship:  Non-intimate, non-romantic association between two or more people (of the same gender or not), such as occasional attendance at recreational or entertainment events (movies, ball games, concerts, etc.) or meals.  (Does not involve conduct which violates the UCMJ.)

    b.  Romantic relationship:  Cross-gender sexual or amorous relationship.  (Does not involve conduct which violates the UCMJ.)

    c.  Unacceptable relationship:  Inappropriate and not allowed under Service policy.  Resolution normally administrative.  Relationship must be terminated or otherwise resolved once recognized.

    d.  Prohibited relationship:  Violates the UCMJ.  Resolution may be either administrative, punitive, or both as circumstances warrant.

    Exhibit 8.H.1 contains a matrix depicting common interpersonal relationships.

## 8.H.2.e.  Violation of Service Policy

Relationships cross gender lines, can develop into romantic relationships, and even lead to marriage.  A relationship, including marriage, does not violate Service policy unless the relationship or the members' conduct fails to meet the standards set by this section, standards of conduct set by the Uniform Code of Military Justice (UCMJ), or other regulations.

## 8.H.2.f.  Unacceptable Romantic Relationships

Romantic relationships between members are unacceptable when:

1.  Members have a supervisor and subordinate relationship (including periodic supervision of duty section or watchstanding personnel), or

2.  Members are assigned to the same small shore unit (less than 60 members), or

3.  Members are assigned to the same cutter, or

4. The relationship is between chief petty officers (E-7/8/9) and junior enlisted personnel (E-4 and below), or

5. The relationship is manifested in the work environment in a way which disrupts the effective conduct of daily business.

The nature of operations and personnel interactions on cutters and small shore units makes romantic relationships between members assigned to such units the equivalent of relationships in the chain of command and, therefore, unacceptable. This policy applies regardless of rank, grade, or position. This policy applies to Reservists in an active status, whether or not on duty.

### 8.H.2.g. Prohibited Relationships

Coast Guard policy prohibits the following relationships or conduct, regardless of rank, grade, or position of the persons involved:

1. Engaging in sexually intimate behavior aboard any Coast Guard vessel, or in any Coast Guard-controlled work place,

2. Romantic relationships outside of marriage between commissioned officers and enlisted personnel. For the purposes of this paragraph, Coast Guard Academy cadets and officer candidates (both OCS and ROCI) are considered officers.

3. Personal and romantic relationships between instructors at training commands and students.

This provision is a punitive general regulation, applicable to all personnel subject to the Uniform Code of Military Justice without further implementation. A violation of this provision is punishable in accordance with the UCMJ.

### 8.H.2.h. Family Relationships

Service members married to Service members, or otherwise closely related; e.g., parent and child, siblings, etc., shall maintain requisite respect and decorum attending the official military relationship between them while either is on duty or in uniform in public. Members married to members or otherwise closely related shall not be assigned in the same chain of command.

## 8.H.3. Examples of Acceptable and Unacceptable Relationships and Conduct

### 8.H.3.a. Acceptable Relationships

Examples of acceptable personal relationships:

1. Two crewmembers going to an occasional movie, dinner, concert, or other social event.

2. Members jogging or participating in wellness or recreational activities together.

**8.H.3.b.    Unacceptable Relationships**

Examples of unacceptable relationships:

1. Supervisors and subordinates in private business together.

2. Supervisors and subordinates in a romantic relationship.

**8.H.3.c.    Unacceptable Conduct**

Examples of unacceptable conduct:

1. Supervisors and subordinates gambling together.

2. Giving or receiving gifts, except gifts of nominal value on special occasions.

3. Changing duty rosters or work schedules to the benefit of one or more members in a relationship when other members of the command are not afforded the same consideration.

## 8.H.4.    Fraternization

**8.H.4.a.    Definition**

Fraternization describes the criminal prohibition of certain conduct between officer and enlisted personnel set out in the UCMJ. Interpersonal relationships between officer and enlisted personnel and fraternization are not synonymous. Fraternization does not apply exclusively to male-female relationships, but a much broader range of inappropriate conduct. (While not an exhaustive listing, ☛ paragraph 8.H.3.) The elements of the offense of fraternization specified in the Manual for Courts-Martial are:

1. The accused is a commissioned or warrant officer, and

2. The accused officer fraternized on terms of military equality with one or more enlisted members in a certain manner, and

3. The accused knew the person to be an enlisted member, and

4. The association violated the custom of the Service that officers shall not fraternize with enlisted members on terms of military equality, and

5. That, under the circumstances, the conduct of the member was prejudicial to good order and discipline in the Armed Forces, or was of a nature to bring discredit upon the Armed Forces.

### 8.H.4.b.  Personal Relationships Between Officer and Enlisted

The custom of the Service accepts personal relationships between officer and enlisted personnel, regardless of gender, if they do not violate the provisions of 8.H.2.c. Relationships in conflict with those provisions violate the custom of the Service.

### 8.H.4.c.  Romantic Relationships Between Officer and Enlisted

The custom of the Service prohibits romantic relationships outside of marriage between officer and enlisted personnel. This includes such relationships with members of other military services. Officer and enlisted romantic relationships undermine the respect for authority which is essential for the Coast Guard to accomplish its military mission.

### 8.H.4.d.  Marriage Between Officer and Enlisted

The custom of the Service accepts officer and enlisted marriages which occur before the officer receives a commission. Lawful marriage between an officer and enlisted service member does not create a presumption of misconduct or fraternization. However, misconduct, including fraternization, is neither excused nor mitigated by subsequent marriage.

## 8.H.5.  Responsibility

### 8.H.5.a.  Primary Responsibility

All personnel are responsible for avoiding unacceptable or prohibited relationships. Primary responsibility rests with the senior member. Seniors throughout the chain of command shall attend to their associations and ensure they support the chain of command, good order and discipline.

### 8.H.5.b.  Early Resolution

Personnel finding themselves involved in or contemplating unacceptable relationships should report the situation and seek early resolution from their supervisor, commanding officer, officer in charge, command enlisted advisor, or Coast Guard chaplain. Any potential conflict with Coast Guard policy should be addressed promptly. Commands are expected to assist members in understanding Coast Guard policy requirements and resolving conflicts. Bringing an unacceptable relationship to early Command attention will increase the opportunity for early, positive resolution.

### 8.H.5.c.  Commanding Officer Responsibility

Coast Guard Regulations Manual, COMDTINST M5000.3 (series) specifically charge commanding officers and officers-in-charge with responsibility for their command's safety, efficiency, discipline, and well-being. They should take prompt, appropriate action to resolve conduct which does not comply with the provisions of this section.

### 8.H.5.d.    Academy and Training Center Staff

Interpersonal relationships involving Academy and Training Center staff and students are particularly susceptible to abuse by the senior member. The Superintendent of the Academy and commanding officers of training commands may issue local directives further restricting or prohibiting such relationships as they deem appropriate. The Superintendent of the Academy may issue supplemental regulations addressing cadet relationships, including when cadets are in training situations aboard other Coast Guard units.

### 8.H.5.e.    Violation by Commanding Officer

If a member's superior or immediate commanding officer is the subject of a report of misconduct under this article, procedures outlined in Section 9-2-2, COMDTINST M5000.3 (series), (Oppression or Other Misconduct by a Superior) shall be followed.

## 8.H.6.    Resolving Unacceptable Relationships

### 8.H.6.a.    General

Avoiding unacceptable personal relationships is in the best interest of all concerned. Training, counseling, and administrative actions help prevent unacceptable personal relationships or minimize detrimental effects when unacceptable relationships develop. Prompt resolution at the lowest level possible is desirable.

### 8.H.6.b.    Training

Avoiding unacceptable and prohibited interpersonal relationships requires that personnel clearly understand Coast Guard policy and its application. The unit training program is an ideal forum to accomplish this. Training on "FRATERNIZATION AND INTERPERSONAL RELATIONSHIPS" shall be conducted at all officer and enlisted accession points and at resident training courses; e.g., leadership school, "A" and "C" Schools, etc. Training at other units is strongly encouraged.

### 8.H.6.c.    Counseling

Early counseling often can resolve potential concerns about the characteristics of a relationship and appropriate actions to ensure the relationship develops in a manner consistent with Service custom. Counseling may be informal or more formal, including written documentation by Administrative Remarks, Form CG-3307 or an Administrative Letter of Censure (☞ Article 8.E.4.). Counseling may include a direct order to terminate a relationship.

### 8.H.6.d.  Personnel Reassignment

Members may request or a command may recommend reassignment of a member involved in a questionable relationship. However, reassignment is not a preferred option. The Coast Guard is not obligated to reassign personnel due to members' desires or based solely on a relationship. When reassignment is not an option, members may be directed to end a relationship.

### 8.H.6.e.  Evaluations

When members do not respond favorably to counseling, comments and marks in officer and enlisted evaluations may be appropriate.

### 8.H.6.f.  Other Administrative Actions

As warranted, commands may recommend separation, removal or withdrawal of advancement recommendations, appointment to another status, or promotions. ☞ Chapter 12 for additional administrative actions which may be considered.

### 8.H.6.g.  Disciplinary Action

Non-judicial punishment or courts-martial may address fraternization or other unlawful or prohibited relationships or conduct.

## 8.H.7.  Action

Commanding officers and officers in charge are responsible for ensuring that all members of their commands are familiar with these provisions.

## Interpersonal Relationships

| Organizational Relationship | Personal | Character of Relationship | | | Married/Family |
|---|---|---|---|---|---|
| | | Romantic | | | |
| Separate Units | 1-4 | 1-2 | 3 | 4 | 1-4 |
| | A | A | U | P | A |
| Same Large Shore Unit or Co-Located Units | 1-4 | 1-2 | 3 | 4 | 1-4 |
| | A | A | U | P | A |
| Same Chain of Command, | 1-4 | 1-2 | 3 | 4 | 1-4 |
| Same Afloat Unit, Small Shore Unit | A | U | U | P | U |
| | | | | | (for assignment purposes) |

**Legend:**

### Member Status:
1. Peers:  (Very similar in rank or position, e.g., officers; CPOs; POs; non-rated personnel; etc.)
2. Military and Civilian CG employee
3. CPO and Junior Enlisted (E-4 and below)
4. Officer (including cadets and officer candidates) and Enlisted

### Character of Relationship:

**Personal:**  Non-intimate, non-romantic associations between two or more people (of the same gender or not), e.g. occasional attendance at recreational or entertainment events (movies, ball games, concerts, etc.) or meals.  (Does not include conduct which constitutes fraternization.)

**Romantic:**  Cross-gender sexual or amorous relationship.  (Does not include conduct which violates the UCMJ.)

**Married/Family:**  Service members married to service member, or otherwise closely related; e.g., parent and child, or siblings, etc.

### Service Policy:

**A = Acceptable:**  Permissible provided conduct meets Service standards. (☛ Article 8.H.2.c.)

**U = Unacceptable:**  Inappropriate; not allowed under Service policy.  Relationship must be terminated or otherwise resolved once recognized.  Resolution is normally administrative.

**P = Prohibited:**  The relationship violates the UCMJ.