# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

## Benjamin J. RUSSELL
### Electrician's Mate First Class (E-6), U.S. Coast Guard

### CGCMG 0287
### Docket No. 1368

### 9 December 2013

General Court-Martial convened by Commander, Coast Guard Pacific Area. Tried at Seattle, Washington, on 19-20 December 2011, and Alameda, California, on 17-24 January 2012.

| | |
|---|---|
| Military Judge: | CAPT Michael E. Tousley, USCG |
| Trial Counsel: | LT Luke R. Petersen, USCG |
| Assistant Trial Counsel: | LT Bryan R. Blackmore, USCGR |
| Civilian Defense Counsel: | Mr. Stephen Carpenter |
| Detailed Defense Counsel: | LT Adrianne M. Mittelstaedt, JAGC, USN |
| Assistant Defense Counsel: | LT Margaret M. Villagran, JAGC, USN |
| Appellate Defense Counsel: | LT Jonathan C. Perry, USCGR |
| | LT Cara J. Condit, USCG |
| | CDR Ted R. Fowles, USCG |
| | Mr. Nicholas Grasselli |
| Appellate Government Counsel: | LCDR Amanda M. Lee, USCG |
| | LT Daniel Velez, USCGR |

### BEFORE
### McCLELLAND, NORRIS & LUCE
Appellate Military Judges

McCLELLAND, Chief Judge:

Appellant was tried by general court-martial composed of officer members. Contrary to his pleas, Appellant was convicted of one specification of attempting to commit an indecent act, in violation of Article 80, Uniform Code of Military Justice (UCMJ); one specification of making a false official statement, in violation of Article 107, UCMJ; four specifications of indecent acts, in violation of Article 120, UCMJ; and three specifications of placing a hidden camera in the head within a berthing area, to the prejudice of good order and discipline, in

violation of Article 134, UCMJ. The court sentenced Appellant to confinement for four months, reduction to E-1, and a bad-conduct discharge. The Convening Authority approved the sentence.

Before this Court, Appellant has assigned the following errors:

I.  The military judge improperly allowed a special agent to offer testimony that should have been characterized as expert opinion testimony as lay opinion testimony under M.R.E. 701, which substantially prejudiced the rights of Appellant.

II.  The military judge erred in denying the defense motion to compel funding for expert consultant.

III.  The military judge erred in requiring Appellant to admit certain investigative notes as a defense exhibit over the objection of counsel. In so doing, the military judge substantially interfered with Appellant's constitutional right to present a defense and disqualified himself as military judge by abandoning his impartial role and acting as counsel.

IV.  This Court should consider the unreasonable and unexplained post-trial delay in determining the sentence that should be approved under Article 66(c), UCMJ.

We specified this issue: Whether Charge IV, Specifications 1-3 fail to state an offense in that they do not include any word of criminality, such as "wrongfully."

We heard oral argument on issues I and II on 30 October 2013. We set aside the findings on Charge IV and its specifications and affirm the sentence.

**Facts**

Appellant was stationed aboard Coast Guard Cutter MELLON (WHEC-717). On 12 November 2010, a "spy camera" with the appearance of a cigarette lighter was found in the head (bathroom) of a fourteen-person female berthing area of MELLON. The camera contained video images of various women engaged in bathroom activities, as well as a few video images of Appellant apparently adjusting the camera. This discovery led to an investigation, during which Appellant confessed to placing a camera in heads, including heads in male berthing areas when he knew women would be taking showers in them; similar video files were found on digital media in Appellant's laptop computer and cellular telephone.

In due course, charges were referred for trial. Among Appellant's pretrial motions was a motion to compel funding for an expert consultant to assist the defense in the field of computer forensics. (Appellate Ex. XXIX.) This motion was denied. (R. at 213; Appellate Ex. LXI.)

At a hearing under Article 39(a), UCMJ, on 17 January 2012, the Government sought to pre-admit certain videos obtained from the camera and from Appellant's laptop computer and cellular telephone. The Government's witness was a Coast Guard Investigative Service special agent with extensive experience, training, and credentials in electronic crimes or computer crimes. (R. at 387-89, 422-24.) He testified that he "forensically imaged" (made copies of) the three digital media, "certified [them] via hash function" (verified that the copies were true copies), and then analyzed and examined the forensic images (copies) using forensic tools (software). (R. at 392.) He testified that peer review was conducted on the work he had done on this case by another forensically trained individual, and explained the procedures that ensure reliability of the work, how the forensic tools work, and other technical details. (R. at 424-30, 433-37, 441-43, 450-56.) In the course of his testimony, he authenticated four DVDs, which became Prosecution Exhibits 2, 3, 4, and 5, containing video files from the camera, laptop computer, and cellular telephone.

At the conclusion of the special agent's testimony, it was noted that he would be recalled for testimony before the members. The military judge asked for confirmation that the witness was being treated as an expert. Trial counsel demurred, asserting that the Government had not asked the witness for opinions; the military judge noted that cross-examination appeared to treat the witness as an expert, and defense counsel stated, "There's no doubt he is an expert." The military judge then stated that the four exhibits "are accepted into evidence, and this witness, when brought back to discuss them, will be treated as an expert." (R. at 467.)

The next business before the court was renewal of the defense request for an expert consultant. Defense counsel supported the request by reference to the witness who had just testified for the Government, declaring that he had rendered opinions. The military judge pointed out that lay witnesses can render opinions, and asked, "And have you not, in fact, made him the expert, not the government?" He then denied the renewed motion. (R. at 468-69.)

A few moments later, the following colloquy occurred:

MJ: And, again, we did not have government concurrence as to whether or not [the special agent] would be treated as an expert. It was just defense's characterization that so made him.

TC: Yes, sir, we anticipate him – we only called him to testify about his extraction of that data, not based upon his opinions about any of the other evidence.

MJ: Very well.

CDC: Okay, so, for the record, it appears as though the government is not offering him as an expert witness. In that case, the defense would retract its characterization of him. I'm not saying he isn't one, because it's clear he is. For the record, I want to make sure that that's clear. Okay, thank you.

(R. at 472-73.)

Before the members, the special agent again briefly recited his experience, training and credentials, and testified that he made forensic images (copies) of the digital media involved in this case and analyzed those copies, extracting video files that were then presented to the members as Prosecution Exhibits 2, 3, 4, and 5.

After the special agent testified concerning video files extracted from the camera, which became Prosecution Exhibit 2, he was asked about video files from the computer. The special agent testified that the relevant files he extracted from the computer were mostly recovered from "free space, which is after the user has deleted the files, the operating system determines that memory space on the hard drive to be free for writing over again." Trial counsel asked, "That free space, does the computer have a way that it just – you know, you delete something and it just automatically overwrites it? How does that work?" Defense counsel objected that the question "is eliciting an opinion of this individual, who's not been qualified as an expert." The objection was overruled, and the question was answered. (R. at 820-21.)

Trial counsel next asked, "Could you tell what device was used to record the videos that you found on the computer?" (R. at 821.) Defense counsel again objected that the question

4

called for an opinion, and an Article 39(a) session ensued. (R. at 822.) During that session, the military judge stated that, as he understood it, "the fundamental evidence that's going to be provided in this case to fulfill the elements of the offense are not – were derived from not deleted files but from open files." (R. at 836.) He overruled the objection. (*Id.*) Later, he appeared skeptical as to whether the witness, even if testifying about deleted files, would be giving expert testimony. (R. at 839.)

In fact, the only evidence of indecent conduct, as defined in Article 120(t)(12)(A), UCMJ, was in deleted files. The three witnesses who were the alleged victims in Charge II, Specifications 1-3, testified that they saw themselves in videos that had been taken without their permission in the following six files: Prosecution Exhibit 3, VID_0002, VID_0024, and VID_0027; Prosecution Exhibit 5, !ID_0024, !ID_0026, and !ID_0027. (R. at 913-17, 932-33, 978). All six of these files were deleted files, either from the computer or from the cellular telephone. (R. at 449, 453-54, 460-63.) The witness who was the alleged victim in Charge II, Specification 4, testified that she saw herself in videos that had been taken without her permission in the three files of Prosecution Exhibit 4. (R. at 984-85; see R. at 446-49.) These three files, too, were deleted files from the computer. (R. at 453-54.) The nine files referred to in this paragraph were the only files admitted that contained evidence of indecent conduct.

Before the members, the special agent testified that there were several video files from the laptop computer that were similar to video files from the camera, in that the view was the same, with a date/time stamp in the same place and in the same format; certain characters near the bottom of the screen were present in both; and the file-naming convention was the same, ending with ".avi". He noted that the videos from both the computer and the camera were three minutes in length. He also stated that "the USB spy camera device had a unique digital serial number, and that same exact serial number was found in the compute registry of the laptop computer, indicating that the USB spy camera device was connected at one time to the laptop computer." (R. at 844-45.)

Video files from the laptop computer became Prosecution Exhibits 3 and 4. (R. at 845.)

Concerning the cellular telephone, the special agent testified that it had the ability to contain the same kind of media as the camera, and its files were like those from the camera in the same respects as those from the laptop computer. (R. at 845-46.) Video files from the cellular telephone became Prosecution Exhibit 5. (R. at 847.)

### Expert testimony

Appellant argues that by deciding the witness's testimony was not expert testimony, the military judge evaded his gatekeeping function to ensure the reliability of expert testimony.

This issue is broadly governed by Military Rules of Evidence[1] (M.R.E.) 701, on lay opinion testimony, and 702, on expert testimony, as amplified by *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 146 (1999). The primary consideration for expert testimony is the reliability of the testimony as based on both the witness's qualifications and the data, theory, or technique being used by the witness. *See United States. v. Quintanilla*, 56 M.J. 37, 85 (C.A.A.F. 2001).

We review the military judge's ruling on this matter for abuse of discretion. *See United States v. Byrd*, 60 M.J. 4, 6 (C.A.A.F. 2004); *United States v. Barron*, 52 M.J. 1, 6 (C.A.A.F. 1999).

Arguably the military judge erred in ruling that the special agent did not testify in an expert capacity. Notably, the testimony that the spy camera device had been connected to the laptop computer was surely an expert opinion, not a lay opinion within M.R.E. 701. There are other potential examples.

However, we need not decide whether the judge erred on this issue. It is clear and undisputed that the special agent was qualified as an expert by virtue of his experience, training, and credentials. That being the case, under M.R.E. 702 he had considerable latitude to testify "in the form of an opinion or otherwise" on the matters upon which he testified as long as his

---

[1] Military Rules of Evidence, Manual for Courts-Martial, United States (2008 ed). The provisions of the Manual for Courts-Martial cited in this opinion are identical in the 2008 and 2012 editions.

principles and methods were reliable, he applied them reliably, and his testimony would "assist the trier of fact to understand the evidence or to determine a fact in issue." We think the record contains ample evidence of reliability of his principles and methods and of their application, and we do not doubt that his testimony assisted the trier of fact to understand the evidence.

Assuming the military judge abused his discretion in his rulings on this issue, the error was harmless.

### Expert consultant

Appellant complains that the military judge denied his request for expert assistance, notwithstanding his showing of necessity. He asserts that expert assistance was needed to effectively cross-examine the Government's expert, the special agent; to conduct independent forensic testing of Appellant's three devices; and to extract exculpatory and mitigating evidence from the devices. (Appellant's AOE & Brief at 23-24.)

A ruling on a request for expert assistance is reviewed for abuse of discretion. *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005) (citing *United States v. Gunkle*, 55 M.J. 26, 32 (C.A.A.F. 2001)).

Appellant was entitled to an expert consultant upon a demonstration of necessity. *Bresnahan*, 62 M.J. at 143 (citing *Gunkle*, 55 M.J. at 31). An accused "has the burden of establishing that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial." *United States v. Freeman*, 65 M.J. 451, 458 (C.A.A.F. 2008) (quoting *Gunkle*, 55 M.J. at 31-32). "To establish the first prong, the accused 'must show (1) why the expert assistance is needed; (2) what the expert assistance would accomplish for the accused; and (3) why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop.'" *Id*. (quoting *Bresnahan*, 62 M.J. at 143).

Defense counsel conducted extensive cross-examination of the special agent. It is by no means clear that cross-examination would have been more effective with the help of an expert.

It is also unclear why counsel would be unable to prepare himself for effective cross-examination. Likewise, there has been no showing that "independent forensic testing" was needed, or even a specific explanation of what was meant by that term.

As to Appellant's hope that an expert could extract exculpatory and mitigating evidence, the mere possibility of assistance is not enough. *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citing *Bresnahan*, 62 M.J. at 143). Although defense counsel asserted that his client had identified possibly useful defense evidence, he did not specify what it was, stating only "the information that we would hope to retrieve would go definitely towards mitigation." (R. at 211.) *See Lloyd*, 69 M.J. at 100 ("Absent a more precise explanation of the theory they hoped to pursue . . . , we cannot find that the military judge abused her discretion when she denied the defense motion for expert assistance."). Appellant has not shown a reasonable probability that the expert would assist the defense in this respect.

We note, too, that the civilian defense counsel apparently availed himself of the opportunity to interview the special agent prior to trial, yet he did not argue the inadequacy of any such interview to the military judge.[2] (R. at 504-08; *see also* earlier arguments found in Appellate Ex. XXIX and R. at 209-16.)

We find no abuse of discretion in the military judge's refusal to order expert assistance. Even if the military judge abused his discretion, we do not believe denial of expert assistance could be said to have resulted in a fundamentally unfair trial. Appellant confessed to much of the conduct of which he was convicted, excepting Charge II Specification 4. (R. at 729-34; Prosecution Ex. 15.)

### Investigative notes

Appellant called as a witness a special agent who was present for an interview of Appellant. In the course of his testimony, this special agent had his recollection refreshed using

---

[2] When trial counsel asserted, at the Article 39(a) motions session, that the defense had not talked with the special agent about his techniques or his examination in general, the defense did not claim that the assertion was untrue. (R. at 212.) Defense counsel did talk with the special agent before trial. (R. at 436.)

his investigative notes.[3] After the witness looked at his notes several times during his testimony, at the instance of the Government the notes were admitted into evidence over defense objection, evidently as past recollection recorded. Contrary to Appellant's characterization of these events, the military judge did not require Appellant to admit the notes, did not act as counsel, did not interfere with Appellant's right to present a defense, and did not err. The fact that the notes remained labeled as a defense exhibit was harmless.

### Specified issue

The three specifications of Charge IV under Article 134, UCMJ, allege in pertinent part as follows:

> In that [Electrician's Mate First Class RUSSELL] did . . ., [specified dates], place a hidden camera in the head within [specified berthing area], onboard USCGC MELLON (WHEC-717), which conduct was prejudicial to good order and discipline in the armed forces.

Conspicuously missing from these specifications is any word of criminality such as "wrongfully." The fact that certain conduct is prejudicial to good order and discipline does not, in itself, make the conduct criminal and punishable under Article 134. *United States v. Hughey*, 72 M.J. 809, 813 (C.G.Ct.Crim.App. 2013).

"Basic to alleging and proving a punishable offense is the existence and identification of a wrongful act or acts that meet the requirements of either or both of the clauses [of Article 134]." *United States v. Hester*, 68 M.J. 618, 620 (C.G.Ct.Crim.App. 2010) (quoting *United States v. Henderson*, 32 M.J. 941, 947 (N.M.C.M.R. 1991)). A specification under Article 134 must include words of criminality to be legally sufficient. Rule for Courts-Martial 307(c)(3) Discussion (G)(ii), Manual for Courts-Martial, United States (2008 ed.); *United States v. Vaughan*, 58 M.J. 29, 35 (C.A.A.F. 2003); *United States v. Brice*, 17 USCMA 336, 38 C.M.R. 134, 138-39 (1967) (citing *United States v. Julius*, 8 USCMA 523, 25 C.M.R. 27 (1957)); *see also United States v. Daly*, 69 M.J. 549, 552 (C.G.Ct.Crim.App. 2010) ("It is certainly true that a

---

[3] The notes were initially labeled Defense Exhibit D for identification and later, after having been admitted into evidence, re-labeled Defense Exhibit B. (R. at 1088, 1099.)

word of criminality such as 'wrongfully' is essential to an adequate specification."), *rev'd on other grounds*, 69 M.J. 485 (C.A.A.F. 2011); *Hester*, 68 M.J. at 621 & n.4.

Specifications that are first challenged after trial are viewed with greater tolerance than those challenged at trial. *United States v. Watkins*, 21 M.J. 208, 209 (C.M.A. 1986).

The Government contends that words of criminality are not required to state an offense under Article 134, arguing that *United States v. Davis*, 26 M.J. 445 (C.M.A. 1988) precludes a holding that the absence of "wrongfully" or any other word of criminality in the specification is a fatal defect. The Government also argues such a holding would be contrary to prior decisions of this Court in *United States v. Nygren*, 53 M.J. 716 (C.G.Ct.Crim.App. 2000), and *United States v. Farence*, 57 M.J. 674 (C.G.Ct.Crim.App. 2002). Our analysis follows the same path as the analysis we carried out in *Hughey*, *supra*.

In *Davis*, the male accused was charged with two specifications of wearing women's clothing, including nylon stockings, bra, nail polish, and the like, "to the prejudice of good order and discipline and of a nature to bring discredit upon the Armed Forces." *Davis*, 26 M.J. at 447. The appellant argued that the specifications were fatally defective because they lacked words of criminality. *Id.* The Court of Military Appeals rejected the argument, opining that "the 'wrongfulness' of the conduct consisted of its threat to good order and discipline and its discredit to the armed forces," and declaring that the allegations of those two elements made the specifications legally sufficient. *Id.* at 448-49. The court observed, "The particular facts and surrounding circumstances recited in the specifications [which included the specific locations of the charged conduct] in this case describe conduct on a military installation which virtually always would be prejudicial to good order and discipline and discrediting to the Armed Forces." *Id.* at 449. The latter observation strongly suggests that the holding is limited to the facts of that case.

Further, we do not believe the *Davis* holding survives the recent cases of *United States v. Fosler*, 70 M.J. 225 (C.A.A.F. 2011), and *United States v. Ballan*, 71 M.J. 28 (C.A.A.F. 2012). In *Fosler*, where no "terminal element" was alleged in the Article 134 adultery specification at

issue, the court held that neither the allegation of adulterous conduct nor the word "wrongfully" implied a terminal element.[4] *Fosler*, 70 M.J. at 230-31. Surely the converse is also true: a terminal element does not imply the word "wrongfully." Likewise, in *Ballan*, the court held that a terminal element was not necessarily implied "from nothing beyond allegations of the act or failure to act itself." *Ballan*, 71 M.J. at 33. Similarly, criminality surely is not necessarily implied from a bare allegation of an act itself.[5] After these decisions, inclusion of the language "which conduct was prejudicial to good order and discipline in the armed forces" in our case does not obviate the need for separate language of criminality.

As for the Coast Guard cases cited by the Government, in *Nygren*, the specification alleged certain acts "in violation of Section 125.07 of the Wisconsin Statutes." This Court held that the allegation of violation of state law constitutes an allegation that the appellant's acts were unlawful. *Nygren*, 53 M.J. at 717. Thus, *Nygren* does not support the notion that words of criminality are unnecessary.

The other Coast Guard case cited by the Government, *Farence*, involved a specification alleging the display of pornographic images depicting bestiality to subordinates, with no word of criminality; the specification was upheld, citing *Davis*. *Farence*, 57 M.J. at 676-77. If the *Davis* holding has lost much or all of its force, the *Farence* holding is equally impaired. Moreover, this case bears little resemblance to either *Davis* or *Farence*. One can understand the Court of Military Appeals, in *Davis* in 1988, calling cross-dressing in certain circumstances "virtually always . . . prejudicial to good order and discipline." It can reasonably be asserted that showing images of bestiality to subordinates, as in *Farence*, would virtually always be prejudicial to good order and discipline. It is not so easy to say the same in this case.[6] The Government, in its brief, invokes respect for opposite-gender berthing areas as private and asserts that Appellant's conduct was clearly injurious to good order and discipline. But the specifications do not allege that the

---

[4] "Prejudice to good order and discipline" and "discredit upon the Armed Forces" are commonly called "terminal elements" of Article 134.

[5] In contrast to the case at bar, in *Vaughan*, the lengthy specification included several details as well as a terminal element. *United States v. Vaughan*, 56 M.J. 706, 707 (A.F.Ct.Crim.App. 2001). The Court of Appeals for the Armed Forces relied on some of those details, implicitly finding that the words "neglect" and "unreasonable" alleged criminality, to uphold the conviction. *Vaughan*, 58 M.J. at 35.

[6] *Farence* puts forward a much broader reading of *Davis* than is supportable, ignoring *Davis*'s "virtually always . . . prejudicial to good order and discipline" language. That broad reading must be regarded as dictum at best.

berthing areas in question were female berthing areas or that the heads in question were expected to be used by women. On the whole, they do not allege circumstances making the conduct virtually always prejudicial to good order and discipline, or any other allegation of criminality.

We do not reach the question, discussed in the briefs, of whether the alleged conduct could be considered criminal under *Parker v. Levy*, 417 U.S. 733 (1974). We hold only that the specifications under Charge IV are insufficient to allege an offense because they contain no word of criminality.

The evidence concerning these specifications is part and parcel of the evidence supporting the specifications of Charge II, under Article 120, and Additional Charge I, under Article 80. The sentence is well below the maximum sentence for the remaining findings. We are certain the sentence would not have been different without these specifications.

### Post-trial delay

Appellant urges us to grant sentence relief on account of unreasonable post-trial delay in referral of his case to this Court.

The Convening Authority took action on 30 April 2012. The record was referred to this Court on 7 June 2012, thirty-eight days after the Convening Authority's action.

The Court of Appeals for the Armed Forces (CAAF) applies "a presumption of unreasonable delay that will serve to trigger the *Barker* four-factor analysis where the action of the convening authority is not taken within 120 days of the completion of trial [and] where the record of trial is not docketed by the service Court of Criminal Appeals within thirty days of the convening authority's action." *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). The "*Barker* four-factor analysis" comprises consideration of the following four factors to determine whether post-trial delay constitutes a due process violation: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Id.* at 135 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).

Appellant does not claim a due process violation, but invokes *Moreno* in support of his claim that the delay in this case is unreasonable. Although the Convening Authority acted expeditiously, beating the 120-day Moreno standard by twenty-three days, the delay in referral is sufficient to raise the presumption under *Moreno*. Accordingly, we will carry out the *Barker* four-factor analysis.

Referral to this Court was delayed eight days beyond the thirty-day period prescribed by *Moreno*. The Government, in its brief, offers no explanation, but calls the delay negligible.

We consider the period between the Convening Authority's action and commencement of appellate review relatively insignificant. The first and second *Barker* factors weigh against the Government, but only slightly. As for the third and fourth factors, Appellant did not assert the right to timely referral and does not claim any particularized anxiety and concern or other prejudice. These factors do not weigh against the Government. Considering all factors, we find no due process violation.

We turn now to Appellant's argument that we should grant sentence relief under *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002), which held that we may grant relief for excessive post-trial delay without a showing of prejudice. *Id.* at 224. Upon finding unreasonable and unexplained post-trial delay, this Court may consider such delay, along with all the other facts and circumstances, in exercising its responsibilities under Article 66(c), UCMJ. *Id.* We have granted such relief in several cases in the past few years. However, we agree with the Government that the eight-day delay in this case is negligible. We decline to grant relief.

### Decision

We have reviewed the record in accordance with Article 66, UCMJ. Upon such review, the findings of guilty of Charge IV and its specifications are set aside and Charge IV and its specifications are dismissed. The remaining findings and the sentence are determined to be correct in law and fact and, on the basis of the entire record, should be approved. Accordingly, the findings of guilty and the sentence, as approved below, are affirmed.

Judge LUCE concurs.


NORRIS, Judge (concurring in part and in the result):

      I concur in part and in the result.  I do not concur in the resolution of the specified issue.  I am not convinced that the specifications under Charge IV are inadequate.



For the Court,


L. I. McClelland
Chief Judge